## *In re* EDWARD S. MAY.

*(District Court, E. D. Michigan.* ———, 1880.)

CONTEMPT—JUROR—CONFERRING WITH A PARTY TO THE SUIT—REV. ST. § 725.—Under section 725 of the Revised Statutes, a juror in a federal court is guilty of a contempt in corruptly conferring with a party to a suit during the trial, it appearing that the court had expressly forbidden the jury to converse with any one regarding the case.

SEMBLE.—It seems that he would be guilty of contempt even if no such direction were given.

CONTEMPT—ANSWER OF RESPONDENT.—In proceedings for criminal contempt the answer of the respondent, in so far as it contains statements of facts, must be taken as true; if false, the government is remitted to a prosecution for perjury.

SAME—SAME.—But the answer must be credible and consistent with itself; and if the respondent state facts which are inconsistent with his avowed purpose and intention, the court will be at liberty to draw its own inferences from the facts stated.

Motion for an attachment for contempt of court.

Respondent was duly empanelled as a juror in the case of *The United States* v. *Sigmund and Feist Rothschild,* indicted with Marcus Burnstine and others for conspiracy to defraud the government. A petition and affidavits having been produced tending to show that respondent had been guilty of misconduct in his capacity of juror, an order was issued to show cause why he should not be attached for contempt. Upon the trial of the principal case the jury were cautioned not to talk with any person, nor allow any person to talk with them, and upon a subsequent day the court again took occasion to direct the jury not to allow any person to converse with them concerning the case, and to accept no treats or hospitality from any person interested in or connected with the case.

The order to show cause set forth that on the twenty-eighth of December, 1879, respondent went in the night-time to the house of Marcus Burnstine, one of the said defendants, but not then on trial, for the purpose of corruptly conferring with said Burnstine of and concerning said cause, and of and concerning the verdict to be rendered therein, and did then and there talk with said Burnstine, and did allow Burnstine

to talk with him, concerning the facts and evidence in the case, and also did corruptly negotiate with said Burnstine as to the verdict he should render in said cause, and that respondent was guilty of misbehavior in the presence of the court, or so near thereto as to obstruct the ends of justice, in the facts above set forth.

The answer of the respondent admitted hearing the orders of the court above referred to, but denied that he violated said orders. Respondent further denied that he had any conversation or negotiations with Burnstine whereby, for any consideration, he would, in declaring his verdict, favor the defendants. With regard to the alleged interview with Burnstine, which took place after the arguments had been concluded, and the night before the charge was given and the case committed to the jury, respondent averred that he was a physician, practicing his profession in Detroit, within a half a block of Burnstine's residence; that on Sunday, the twenty-first day of December, a man, calling his name Miller, residing, as he said, upon Gratiot street, called upon the respondent for professional treatment; that, after examining and prescribing for him, Miller said to him, "You are a juror in the tobacco trial," and began to talk of the innocence of Rothschild, and his standing in the community, when the respondent said to him, most emphatically, that he must not talk in that way to him, as it was against his duty to speak of the case; that Miller then stated that the respondent's conscience was too tender, or words to that effect, and that he could just as well make money out of this; that he had himself once been a juror, and got $250, and nobody ever heard of it. Respondent protested against such talk; and when Miller was going toward the door he said that respondent could make $400 or $500, and that he would call again.

He further says that he made up his mind to inform the court of the matter next morning. But on further reflection, remembering the man's statement that he would call again, respondent determined to wait, accept what he might offer him, and present it to the court with a public exposure; that on the same day he prepared an envelope and addressed it to

the judge of the court, in which he proposed to put whatever should be handed to him by Miller, seal it up and hand it to the court in that condition; that he carried the envelope in his pocket all that week but did not again see Miller; that in the latter part of the week he became anxious about the matter; thought he had neglected his duty in not exposing the matter at first, and thought again of speaking to the court, but did not from the fact that he had not ascertained positively whom the said Miller represented, and that he might be doing a grave injury and injustice to the defendants, if it should turn out that he did not represent them, as he considered that the trial was nearly at an end, and that Miller might possibly, if representing an interest adverse to the Rothschilds, have taken just that course to prejudice them with the respondent as a juror, and thinking the matter over he concluded that a man who would want to do a grave injury to Rothschild might have taken the very course that Miller did take to injure him.

He further averred that he was clearly of the opinion that he ought not to allow the trial to close without taking some steps in regard to the matter; and on the evening of Sunday, the twenty-eighth of December, before it was fairly dark, respondent, thinking that if Miller had come from the defendants Burnstine would know all about it, respondent could determine the fact as to whom Miller represented by going to Burnstine; that he went up the steps of Burnstine's house and rung the bell; a boy came to the door, who asked respondent in, but respondent declined to go in, and asked to have Burnstine step to the door. Burnstine came to the door. Respondent asked him if he knew him, when respondent asked him, "Do you know a man by the name of Miller," believing that, from the question being put in that way, if Miller had any privity with Burnstine the matter would be exposed by Burnstine, and he would think respondent came to treat with reference to Miller's proposition. Without answering that directly, Burnstine insisted upon respondent coming in, which he did, and stayed not to exceed five minutes, when the whole conversation turned upon the question

whether Miller represented or came from the defendants, which was all that respondent wanted to know. Burnstine, on his side, said that Miller did not represent them, and that he did not know of any such man, but said that Rothschild might, and he would go and get Rothschild.

Respondent refused to allow him to go and get Rothschild at all, but said that he, the respondent, simply wanted to know the fact as to whether Miller came from the defendant or not. Burnstine asked respondent what he thought of the case, when respondent at once stated that he could not talk with him about that, but simply wanted to know the fact stated, and would not stay and converse with him and Rothschild, and told him that he knew nothing about the jury; that he could not get a word out of him, respondent, and that respondent would not talk about the case at all, or as to the way the jury stood. Respondent was about going out, and Burnstine said he was going down to see Rothschild, and he would find out whether he knew Miller or anything of him, and asked the respondent if he would call at 10 o'clock, when he would let him know. He further offered respondent a cigar and a drink, which he declined. He did call again about 10 o'clock, when Burnstine, with something of an air of mystery, insisted that respondent should walk through to his office. Respondent went in but did not sit down, when Burnstine said that Rothschild knew nothing of Miller at all, and that Rothschild scouted the idea; that he would have nothing to do with buying or corrupting a juror, and stated they would not pay a cent to any one for such purpose, but he said that the matter with regard to Miller was very important, as they had no doubt but that Miller represented the other side, and that the defence had been trying to catch some one doing just this thing, as they knew it was going on, and he said to respondent that the man called Miller undoubtedly represented the other side, and asked respondent to point him out in the court room the next morning so that he might be exposed, or to let the lawyers of the defence know whenever respondent could put his eyes on him again, and say nothing about it until he was caught, to which respondent assented.

He further averred that at both interviews he had he related the substance of his conversation with Miller, but, from the first, having the purpose in view of getting Rothschild and Burnstine to admit their connection with Miller, if true. He thinks that the respondent may, by his manner, have invited a continuance of the Miller negotiation; that in these interviews he became satisfied that neither Rothschild nor Burnstine had anything to do with the man that had approached him, and became thoroughly satisfied the object the man had was to injure the defendants. He further averred that he made no secret of his going to Burnstine's; went in and out the front way both times, and was not disguised in any manner, and in neither interview did the respondent talk himself, or allow said Burnstine to talk to him, about the facts of the case then on trial; that up to that night he had never spoken to Burnstine, nor has he spoken a word to him since. He further denied any contempt, and if his going to Burnstine's house was a disobedience of the order of the court it was not so to respondent's knowledge or understanding of the orders, and he did it for the purest and best motives, and for the purpose of serving the ends of justice, by exposing fraud and corruption, which it seemed impossible to accomplish in any other way; as, if the man who had attempted to corrupt the respondent represented the defence, it could have been ascertained in no better way than by respondent in person applying to Burnstine, and he did it with the motive and intention that if he should fasten the corrupt approach of Miller upon the defence he would have exposed it the next morning, and he did not think the ends of justice would be subserved to expose the facts otherwise until Miller could be identified; that he did not inform any person of the matter for the reason that he thought a grave crime had been committed, and he desired to identify the man and bring him to justice; and he believed that if he did give any information to the court at that late stage of the case, there being no time for an investigation, it would simply put the guilty parties upon their guard, and might prejudice the minds of the court and jury against the defendants, because the respondent would

be obliged to state that the man claimed to represent the defence, and leave no time to disabuse their minds.

He further says that his action in maintaining his position for an acquittal upon the jury was in accordance with his judgment upon the evidence, as confirmed by the charge of the court, and that, added to this, the information that he had received as before stated, convincing him of indirect methods having been used to influence him, the respondent, impelled him to maintain the innocence of said Rothschild on the jury to the last. He further denied receiving money or any other consideration for his vote upon the jury, and submitted that his conduct had been free from censure.

*S. M. Cutcheon,* District Attorney, and *H. J. Beakes,* for the government.

*John Atkinson* and *Theodore Romeyn,* for respondent.

BROWN, J. By Rev. St. § 725, the power of the federal courts to punish for contempts is limited to three classes of cases: *First,* a misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice; *second,* misbehavior of any officer of the court in his official transactions; and, *third,* disobedience or resistance of any officer, party, juror, witness or other person, to any lawful writ, process, order, rule, decree or command of the courts. *Ex parte Robinson,* 19 Wall. 505, 511.

It is not necessary here to discuss the question whether, in the absence of the express order of the court to the jury to refrain from conversing with any one regarding the case, a juror could be punished for such misconduct. It would seem, however, that such violation of duty might be reached under the first class of cases, as the misbehavior of a person so near the presence of the court as to obstruct the administration of justice therein. The act does not define how near the court the misbehavior must be, nor the character of such misbehavior, and I think it may be fairly construed to extend to any misbehavior by a juror, in his capacity as such, wherever committed, since such misbehavior necessarily tends to obstruct the administration of justice. *U. S.* v. *Devaughan,* 3 Cr. C. C. 84; *State* v. *Doty,* 32 N. J. 403. Otherwise it would

be impossible for the federal courts to punish a juror, even for receiving a bribe, since there is no statute making the receipt of a bribe by a juror a crime. The act was passed for the purpose of preventing the courts from interfering with newspaper comments upon trials. It seems to me it could not have been the intention of congress to take away from the courts the common law power of punishing jurors for misconduct. Upon this point, however, I express no opinion, as it is admitted there was an order given, and the only question is whether respondent disobeyed it.

It is a cardinal rule in proceedings for a criminal contempt that the answer of the respondent cannot be traversed and must be taken as true. If false, the government is remitted to a prosecution for perjury. 4 Black. Com. 287; *In the matter of Pitman,* 1 Curt. 186; *U. S.* v. *Dodge,* 2 Gall. 313; *State* v. *Earl,* 41 Ired. 464; *Burke* v. *The State,* 47 Ired. 528; *People* v. *Feed,* 2 John. 290; *In re Moore,* 63 N. C. 397; *Nomes* v. *Cummins,* 1 Lester, 40.

But the answer must be credible and consistent with itself, and if the respondent states facts which are inconsistent with his avowed purpose and intention, the court will be at liberty to draw its own inferences from the facts stated. *In the matter of Crossley,* 6 Term R. 701; *Ex parte Nowlan,* Id. 118. For instance, if the respondent in this case had stated that in his interview with Burnstine he had asked and received of him a $1,000, and had kept the money in his pocket until after the jury were discharged; and had further stated that he did this for the purpose of delivering the money to the district attorney and prosecuting Burnstine for bribery, it would scarcely be contended that the court would be bound to draw the same inference from his conduct. So, then, it is, after all, a question in every case whether the facts stated are consistent with an honest intent.

The prosecution insist in this case that Miller was a myth; that respondent's story with regard to his interview with him was concocted solely for the purpose of explaining the subsequent interview with Burnstine. The court, however, cannot accept this theory. I must take it for granted that the

interview with Miller was had substantially as stated. Respondent had no power to prevent Miller from conversing with him as he did, and suggesting that money might be made out of the case, but he should at once have disclosed the fact to the court; or, at least, he should not have assumed to take on the character of a detective and work up a case for the government without consultation with the officers of the government. If, as Miller said, he had been present several days during the trial, he was probably present during some of the days that succeeded his interview with the respondent, and might have been identified. Respondent, however, seems to have made no effort to ascertain whether Miller was in the court room, but keeps the facts to himself for a whole week, and at the most critical moment of the trial, after the arguments had been concluded, and the evening before the jury were to be charged, goes to the house of one of the defendants after dark to ascertain whether Miller represented him or any of the other defendants in the case. What business was it to him whether Miller was sent by the defendants or not? Suppose he had been sent by Burnstine, what was the respondent to do about it? He was not even content to take Burnstine's word that he knew nothing about Miller, but consented to make another visit at a late hour in the evening, in the meantime suggesting to Burnstine that he see Rothschild and learn whether he knew anything of Miller. The records of the court show that the jury in this case disagreed. It does not, of course, show how they stood. But the respondent, in his answer, admits that he continued to vote for an acquittal until the end, giving, among other reasons, that he thought Miller had been trying to prejudice him *against* the defendants, when he admits that Miller had talked of the innocence and good standing of the defendants, and had suggested that money might be made out of the case.

Suppose a verdict of guilty had been rendered, or, to put the case stronger, suppose it had been a civil case and a verdict had been rendered for the defendants, would it not have been the duty of the court, on respondent's own showing, and

to put the most favorable construction upon it, to grant a new trial on account of his misbehavior? It seems to me entirely clear that it would. Without looking at the affidavits upon which this order was issued, and which show a somewhat different state of facts, it seems to me clear, beyond a reasonable doubt, that respondent went to Burnstine's house, not for the purpose of detecting Miller or any other person, but rather with the intention of entering into a corrupt negotiation with Burnstine. He thus put himself in a position where he could not do otherwise than persist in voting for an acquittal, since an exposure of his conduct was certain, if defendants were convicted. The respondent is therefore adjudged guilty of the specification charged in the order to show cause, viz.: "Going in the night-time to the house of Marcus Burnstine, one of the defendants, for the purpose of corruptly conferring * * * with said Burnstine of and concerning said cause, and of and concerning the verdict thereafter to be rendered therein;" and is further adjudged to pay a fine of $100, and to be committed to the Detroit House of Correction until the terms of his sentence are complied with.