### KIRK et al. v. UNITED STATES ex rel. TODD, U. S. Atty.

(Circuit Court of Appeals, Ninth Circuit. December 4, 1911.)

#### No. 1,975.

1. CONTEMPT (§ 60*)—CORRUPTING JURORS—EVIDENCE.

Evidence *held* to warrant a finding that defendants were guilty of contempt in attempting to corrupt and influence certain jurors whom it was expected would sit in the trial of a criminal case.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 182–187; Dec. Dig. § 60.*]

2. CONTEMPT (§ 33*)—JURISDICTION—FEDERAL COURTS—STATUTES.

Rev. St. § 725 (U. S. Comp. St. 1901, p. 583), provides that the jurisdiction of federal courts to punish contempts shall not be construed to extend to any case except the misdemeanor of any person in their presence, or so near thereto as to obstruct the administration of justice. *Held*, that where defendants attempted to corrupt jurors whom they expected would sit in a criminal trial about to be held in the same city, and such acts occurred in a saloon several blocks from the place where court was held, it was sufficiently near to the court to obstruct the administration of justice, and was therefore within the court's jurisdiction to punish, though it did not occur on property belonging to the United States or occupied or used by the court.

[Ed. Note.—For other cases, see Contempt, Dec. Dig. § 33.*]

3. CONTEMPT (§ 61*)—DENIAL UNDER OATH—FAILURE TO ANSWER.

The common-law rule that a person charged with contempt is entitled to his discharge where he files an answer which is direct, and not eva-

sive, explicitly denying the alleged contempt, had no application where defendants charged with contempt did not answer the petition, but went to trial on the charges made, and gave oral testimony in which they denied the incriminating facts under oath.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 188–194; Dec. Dig. § 61.*]

4. CONTEMPT (§ 58*)—FOREIGN ANSWER—CONCLUSIVENESS.
Under Rev. St. § 725 (U. S. Comp. St. 1901, p. 583), authorizing federal courts to punish for contempt, the filing of a sworn answer to a petition explicitly denying the alleged contempt is not necessarily conclusive that defendant is not guilty.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 169–175; Dec. Dig. § 58.*]

In Error to the District Court of the United States for the Northern Division of the Western District of Washington.

Contempt proceedings by the United States, on relation of Elmer E. Todd, United States Attorney for the Western District of Washington, against E. D. Kirk and another. From a judgment of conviction, defendants bring error. Affirmed.

On January 23, 1911, the United States attorney for the Western District of Washington, by petition, informed the United States District Court of that district that the plaintiffs in error had between January 16 and January 23, 1911, approached members of the venire of jurors then in attendance upon said court in the interest of one C. D. Hillman, who had been indicted for violation of statutes of the United States, and whose trial was set before that court for January 31, 1911, with the intent corruptly to influence said members of the venire in behalf of said Hillman, and with the promise and suggestion that they would be paid money in case they should be in favor of the said Hillman. Upon that petition the plaintiffs in error were, upon a hearing before the said District Court, adjudged guilty of contempt, and sentenced to imprisonment. In its judgment, the court found the facts as follows: "That heretofore, to wit, between the 1st and 23d day of January, 1911, the defendants E. D. Kirk and M. J. Webb were engaged in a conspiracy and plot to corrupt the jurors of this court in connection with the trial of the case of the United States vs. Clarence Dayton Hillman, which is now pending in this court and set for trial for January 31, 1911; that Charles McCoy, who is a member of said venire, was approached between the 1st and 23d day of January, 1911, by two persons unknown for the purpose of offering him money to influence his action in said cause if he were chosen as a trial juror; that Robert C. Van Horn, a member of said venire, was corruptly approached between the two dates last aforesaid by said E. D. Kirk and M. J. Webb for the purpose of influencing his action in the event he should be chosen as a trial juror in said cause, and that promises of money were made to him by said Kirk if he should be favorable to the defendant, and that said Webb counseled the making of said promises by said Kirk and aided said Kirk in making the same; that said defendants E. D. Kirk and M. J. Webb between the two dates last aforesaid employed one W. H. Tyng to get into communication with other members of the venire for the purpose of ascertaining whether they could be approached with offers of bribes or not. The court finds the testimony of said witnesses McCoy, Van Horn, and Tyng to be true, and that the misbehavior of the said E. D. Kirk and M. J. Webb took place in the city of Seattle with the knowledge on their part that said men so approached and to be approached were members of the venire now in attendance upon this court, and that from said venire the trial jury in the case of United States vs. Clarence Dayton Hillman would be drawn, and with the intent on the part of the said E. D. Kirk and M. J. Webb corruptly to influence the verdict in said cause, and that said misbehavior of the said E. D. Kirk and M. J. Webb occurred in the city of

Seattle and so near to the presence of this court as to obstruct the administration of justice in this court, and that said acts of said defendants constitute contempt of this court;" and further found that the place where the juror Robert C. Van Horn was corruptly approached by the plaintiffs in error with suggestions of the payment of money for the purpose of influencing his action in the event that he should be chosen as trial juror in the case of The United States against Hillman was distant from the United States Federal Court Building, about 9 blocks, said blocks averaging 300 feet each.

Longfellow & Fitzpatrick and Dudley G. Wooten, for plaintiffs in error.

Elmer E. Todd, U. S. Atty., pro se.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). [1] We find no merit in the contention that the evidence was not sufficient to justify the judgment of the District Court, who heard the testimony of the witnesses and examined the exhibits which were introduced in evidence. The plaintiffs in error were detectives operating what was known as the "Kirk Detective Agency," the office of which was situated within one block of the United States courthouse. About the middle of January, 1911, they were employed by C. D. Hillman, against whom the trial of six indictments was then pending in the United States District Court for the Western District of Washington. The cases had been set for trial for January 31, 1911. They were the only criminal cases set for trial in that court prior to March 28, 1911. There was evidence that the plaintiffs in error employed one W. H. Tyng to go about and get acquainted with certain jurors whose names were on a list which they gave him of members of the venire then in attendance upon the court, and from which the jury was to be selected in the trial of the cases against Hillman. Tyng testified that his instructions from one of the plaintiffs in error were to "get jurymen." "He told me, if I went around and got any jurymen, he would give me $100 first, and then he said $50 a few days afterwards. * * * I was to get them and bring them to the office if I could handle them in any way, shape, or manner." And he testified that the plaintiffs in error told him that they had another man employed on the same kind of business. C. B. McCoy, one of the veniremen, testified that he had been approached by two men with reference to the Hillman Case about January 18 or 19, 1911; that they wished to know if a few hundred dollars would influence him to land the jury, but that the men were not the plaintiffs in error, and were unknown to him; and that afterwards a man who gave his name as Miller called him up by telephone, stating that he wished to talk the case over with him. Robert C. Van Horn, who was one of the jurors on the panel, testified that he was first approached by telephone by one who gave his name as Kling, who stated that he wished to see him about a matter of much interest, in which there would be several hundred dollars, and that he made an appointment to meet Kling the next day at O'Brien's saloon; that he met Kling, and that Kling then made an appointment with him to meet other people at Hyde's saloon

at half past 4 on the following day; that he met Kling at that saloon, according to appointment, but the others did not appear; that then Kling gave him a card with a telephone number on it, and asked him to call up Mr. Webb. The telephone number given was the telephone number of the Kirk Detective Agency. Van Horn then testified that he called up Webb, who stated that he would meet him at a quarter of 6, and said: "I have a friend here who wants to meet you, a Mr. Kirk." At the time appointed Van Horn testified that he returned to the saloon, and that Kling then introduced him to Webb, and that Webb, in turn, introduced him to Kirk; that Kirk seemed to be under the impression that he was going to meet an old friend of his, a Robert Van Horn of Kansas City.

The witness testified:

"Finally I mentioned to him that it was strange if he wanted to renew an acquaintance with an old friend that he should have gone about it in such a roundabout manner, and in such a peculiar way of renewing an old friendship. He said, 'Well, it was;' but there was another matter, since I resembled his old friend so much, and for various reasons that didn't appear to be relevant he would be glad to take up with me another matter that came to his mind just at that minute, if I was in a receptive condition."

That Kirk took him aside, and said there was a matter pending in the federal courts that he was interested in. That the sum and substance of it was that a friend of his was going to be brought into court on a criminal charge, and that they wished very much to hang the jury in the case.

"He put it to me something like this: 'We don't want to give you some money simply to buy your opinion on a case, but we just want to know if you have an opinion a certain way, and if it is very favorable to us, and you will give us to understand that you would still keep that opinion on a jury, and would hang the jury, it would be worth your while.'"

The witness detailed the conversation at some length, and said that Kirk told him it would be worth $100; and he testified:

"He said the case was set for trial within two weeks, and I asked him if that was the Hillman case. Q. What did you say? A. I asked him if it was the Hillman Case set for March 28th, and I understood that the Hillman Case was set for March 28th, and I asked if it was the Hillman Case set for March 28th, and he said, 'No;' it was within two weeks."

As a matter of fact the Hillman Case was set for trial within two weeks from the date of the conversation, and it elsewhere appears how Van Horn obtained the impression that the case was set for March 28th. The plaintiffs in error testified denying the incriminating portions of the testimony of Van Horn, but admitted that they had the appointment to meet him at the O'Brien saloon, and that they did meet him at the Hyde saloon in the manner in which he testified. They testified that Van Horn said he did not want to sit on that jury, and that, when Kirk asked him what jury he was talking about, he said the Hillman jury. That Kirk then said, "Goodnight! I don't want to talk to you if you are on the Hillman jury;" and that Van Horn said that he wanted $100 cash now, and $150 when the case was over. That Kirk replied: "Well, if you are a juror, I don't want to talk to you. I have nothing to do with this Hillman jury. I can

tell you that." The explanation which the plaintiffs in error gave of their desire to meet Van Horn was that they supposed him to be an old friend of Kirk, whom Kirk had known in Kansas City. The reason so given falls far short of explaining the devious and mysterious methods taken to secure the interview, and it fails to explain why Webb and Kirk both desired to meet Van Horn, or why Van Horn was requested to call up Webb over the telephone on a suggestion from Kling that an interview with Webb might result in a transaction whereby Van Horn could make some money. On reading the whole testimony, we cannot see how the judge who heard it could entertain any reasonable doubt of the guilt of the plaintiffs in error as charged in the petition.

[2] The plaintiffs in error do not deny that acts such as those which are charged in the petition and found by the court below would tend to obstruct the administration of justice; but they urge, and this is their principal contention, that the acts so charged were not committed in the presence of the court, or so near thereto as to obstruct the administration of justice, within the meaning of section 725, Revised Statutes, which expressly provides that the power of the federal courts to punish contempts "shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice." The acts of the plaintiffs in error, which are established by the proofs herein, occurred several blocks distant from the place where the court was held, and not upon property belonging to the United States or occupied or used by the court. The question is, Were they committed so near to the presence of the court as to tend to obstruct the administration of justice therein? Section 725 of the Revised Statutes was adopted by the act of March 2, 1831 (U. S. Comp. St. 1901, p. 583), immediately following the conclusion of proceedings against District Judge Peck, who was impeached for imprisoning an attorney for criticism of one of his decisions after the case had ended in his court. It was the purpose of the act to limit the power of federal courts to punish as for contempt criticisms of judicial decisions or judicial officers, and it seems clear that the limitation expressed in the words, "so near thereto as to obstruct the administration of justice," was meant to apply more particularly to that class of contempts and to acts of turbulence and disorder committed not in the presence of the court, nor so near thereto as to present an obstacle to the orderly administration of justice, and not to misbehavior which, at whatever place committed, would tend as completely to obstruct the administration of justice as if committed in the immediate presence or in the vicinage of the court. It is obvious that any willful attempt improperly to influence jurors in the impartial discharge of their duties in a pending case, whether by attempts to bribe or otherwise, no matter where it is committed, is sufficiently near to the presence of the court to tend to obstruct the administration of justice. It is not to be supposed that in enacting the statute Congress intended to deprive the federal courts of the power to deal summarily with persons who are attempting to corrupt jurors who have been called to decide pending cases, for without that power the courts would be practically helpless

in the presence of an organized scheme, such as is shown by the evidence in this case, for the purpose of interfering with the administration of justice. There is every reason why the court should have the power to deal with such attempts at their very inception, so as to prevent the evil, and should not be confined to the remedy by indictment to punish such acts after the evil has been accomplished.

The question of the construction of section 725 was before the Supreme Court in the case of Savin, Petitioner, 131 U. S. 267, 9 Sup. Ct. 699, 33 L. Ed. 150, and Cuddy, Petitioner, 131 U. S. 280, 9 Sup. Ct. 703, 33 L. Ed. 154. In the first of those cases it was held that an attempt to deter a witness in attendance upon a court of the United States in obedience to a subpœna while he was in the jury room near the courtroom from testifying for the party in whose behalf he was summoned, and offering him in the hallway of the courthouse money not to testify against the defendant, was misbehavior in the presence of the court, and the court said that it was "unnecessary to consider, as argued, whether the words 'so near thereto as to obstruct the administration of justice' refer only to cases of misbehavior outside the courtroom, or in the vicinity of the court building, causing such open or violent disturbance of the quiet and order of the court while in session as to actually interrupt the transaction of its business." In the second case the petitioner Cuddy had been adjudged guilty of contempt in approaching one of the jurors with the object of improperly influencing his action, in the event he should be sworn as a juror in a case then pending in the District Court. In the petition for a writ of habeas corpus, nothing was said as to the place where Cuddy approached the juror. The Supreme Court affirmed the judgment of the court below, denying Cuddy's application for the writ, holding that every intendment should be made to support the judgment of the District Court when collaterally attacked, and said:

"Whether the attempt to influence the conduct of the term trial juror McGarvin was or was not within the meaning of the statute misbehavior so near to the court as to obstruct the administration of justice, however distant from the court building may have been the place where the appellant met him, is a question upon which it is not necessary to express an opinion."

But Judge Brown said (In re Edward S. May [D. C.] 1 Fed. 737):

"The act does not define how near the court the misbehavior must be, nor the character of such misbehavior, and I think it may be fairly construed to extend to any misbehavior by a juror in his capacity as such, wherever committed, since such misbehavior necessarily tends to obstruct the administration of justice."

And in Re Brule (D. C.) 71 Fed. 943, Judge Hawley held that bribing one who was known to be a witness in a pending cause to hide himself and remain away from the court was contempt of court, and was misbehavior committed so near to the court as to obstruct the administration of justice, although the act was done at the residence of the witness at some distance from the courthouse, in the town where the court was held. He said:

"But the statute says that the misbehavior of a person so near thereto as to obstruct the administration of justice may be likewise punished as a contempt of court. If it is a contempt to bribe a witness in front of the court-

house door, is it not a contempt to attempt to do the same thing on the street opposite the court building, or four blocks away? Is not the result the same? Is not the motive of the accused the same? What difference does it make whether the attempt was made on the ground owned by the United States or at the residence of the witness in the same town four blocks or about one quarter of a mile away from the court building? In one case the misbehavior would be construed to be in the presence of the court, and in the other 'so near thereto as to obstruct the administration of justice,' and the statute in clear language is made to apply to both cases."

So in United States v. Carroll (D. C.) 147 Fed. 947, Judge Wolverton was of the opinion that a direct attempt by a person to bribe by persuading a witness to testify contrary to the truth in a cause pending or to influence the jury or any member thereof to find a verdict in favor of one party or the other, made on the street in the immediate vicinity of the court, constitutes a direct contempt. In McCaully v. United States, 25 App. D. C. 411, the court said:

"There is no possible difference between the corrupt solicitation of a juror at the courthouse door or in the corridors of the courthouse or in some obscure nook of the building, and a precisely similar corrupt solicitation at the home of the juror or the place of business of the corruptor. The offense is no greater in the one case than in the other, and its influence upon the administration of justice is precisely the same in both cases. We cannot think that in the enactment of the statute in question Congress had any intention to institute a topographical discrimination between acts which have no possible relation to the matter of greater or less distance from the courthouse."

[3] It is contended that, upon the denial which the plaintiffs in error made under oath of the acts with which they were charged in the petition, the court below lost jurisdiction to proceed further, and that the plaintiffs in error were entitled to their discharge. It is true that at common law, when the answer of the accused was direct and not evasive, and explicitly denied the alleged contempt, the answer was conclusive, and no evidence could be received, and it was only in a suit in chancery that the court was permitted to inquire concerning the truth of the answer. United States v. Anonymous (C. C.) 21 Fed. 761; United States v. Debs (C. C.) 64 Fed. 724. It might be a sufficient answer to the contention of plaintiffs in error to point to the fact that they filed no answer to the petition, but went to trial upon the charges therein made, and that it was after the government had introduced its evidence concerning the facts of the alleged contempt that they gave their oral testimony, in which they made denial under oath of the incriminating facts theretofore disclosed on the trial. Such oral evidence in court offered to rebut the evidence which had been adduced against them ought not to be held to take the place of the sworn answer which at common law was sufficient to purge the accused of contempt.

[4] But, even if the testimony of the plaintiffs in error is to be taken as standing in the place of a sworn answer to the petition, it should not be held conclusive of the contempt in a case such as that which is here presented. In Re Edward S. May (D. C.) 1 Fed. 737, Judge Brown said:

"But the answer must be credible, and consistent with itself, and, if the respondent states facts which are inconsistent with his avowed purpose and

intention, the court will be at liberty to draw its own inferences from the facts stated."

In the Savin Case, referring to the contention that the court in the contempt proceedings had refused to require service of interrogatories upon the accused, so that in answering them he could purge himself of the contempt charged, the court said:

"The court could have adopted that mode of trying the question of contempt, but it was not bound to do so. It could, in its discretion, adopt such mode of determining that question as it deemed proper, provided due regard was had to the essential rules that obtain in the trial of matters of contempt."

In Re Perkins (D. C.) 100 Fed. 950, it was said:

"The question of whether a party answering a charge of contempt, whether by rule or otherwise, was guilty of a willful contempt, or has properly purged himself thereof, is a question for the court in the exercise of a sound discretion."

The whole question, however, of the obligation of the federal courts to observe in law cases the common-law rule, is put at rest by the decision of the court in United States v. Shipp, 203 U. S. 563, 27 Sup. Ct. 165, 51 L. Ed. 319. Of the history of the common-law rule, the court said:

"It may be that it was an intrusion or perversion of the canon law, as is suggested by the propounding of interrogatories, and the very phrase, 'purgation by oath' (juramentum purgatorium). If so, it is a fragment of a system of proof which does not prevail in theory or as a whole, and the reason why it has not disappeared perhaps may be found in the rarity with which contempts occur. It may be that even now, if the sole question were the intent of an ambiguous act, the proposition would apply. But in this case it is a question of personal presence and overt acts. If the presence and the acts should be proved, there would be little room for the disavowal of intent. And, when the acts alleged consist in taking part in a murder, it cannot be admitted that a general denial and affidavit should dispose of the case. * * * Whether or not Rev. Stat. § 725, applies to this court, it embodies the law so far as it goes. We see no reason for emasculating the power given by that section, and making it so nearly futile as it would be if it were construed to mean that all contemnors willing to run the slight risk of a conviction for perjury can escape."

The judgment is affirmed.