UNITED STATES v. HUFF.

(District Court, S. D. Georgia, W. D.   May, 1913.)

**1. CONTEMPT** (§ 3*)—NATURE AND FORM OF REMEDY—CONVERSION OF CIVIL INTO CRIMINAL PROCEEDING.

A contempt proceeding, although instituted in civil form by an order made in a pending suit directing the issuance of an attachment to bring the defendant into court, may be converted into a criminal proceeding by the intervention of the United States and the filing of a motion asking to be made plaintiff therein.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. § 4; Dec. Dig. § 3.*]

**2. CONTEMPT** (§ 38*)—DEFENSES—PLEA OF FORMER JEOPARDY.

The overruling of a demurrer filed by a defendant cited for contempt, and the continuance of the cause for trial on the merits before another judge, will not support a plea of former jeopardy, when by the substitution of the United States as plaintiff the cause is converted into a criminal proceeding.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 117–121; Dec. Dig. § 38.*]

**3. CONTEMPT** (§ 58*)—DENIAL UNDER OATH IN ANSWER—CONCLUSIVENESS.

The common-law rule that one charged with contempt may purge himself, and be entitled to a discharge, by the filing of a sworn answer denying the contempt, is not recognized by the federal courts, which leave the question to be determined by the proofs on the hearing.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 169–175; Dec. Dig. § 58.*]

**4. CONTEMPT** (§ 6*)—POWER OF FEDERAL COURTS TO PUNISH—CONSTRUCTION OF STATUTE—"MISBEHAVIOR SO NEAR THE COURT AS TO OBSTRUCT ADMINISTRATION OF JUSTICE."

In the provision of Rev. St. § 725 (U. S. Comp. St. 1901, p. 583), and Judicial Code (Act March 3, 1911, c. 231) § 268, 36 Stat. 1163 (U. S. Comp. St. Supp. 1911, p. 237), limiting the power of federal courts to punish for contempt to "misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice," the second clause is not restricted in meaning to acts committed so near in point of distance to the place of holding court as to be obstructive to orderly procedure, which are covered by the preceding clause as construed by the Supreme Court, but applies to all acts of misbehavior whose natural tendency and effect are to interfere with the administration of justice, wherever the acts may be committed.

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 6, 9, 10, 13; Dec. Dig. § 6.*]

**5. CONTEMPT** (§ 2*)—ACTS CONSTITUTING CONTEMPT—LETTERS TO JUDGE RELATING TO PENDING SUIT.

Defendant wrote and sent letters to a federal judge, which were delivered to him in a room of his residence where he frequently heard matters in chambers, although it was not being so used at the time. The letters related to a pending suit, to which defendant was a party, and in which the judge was still required to take judicial action substantially affecting defendant's interest. Much of the letters was devoted to per-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sonal abuse of the judge, either generally or because of his past actions in the suit, and they also contained references relating to action to be taken in the future, with implied threats in case such action did not conform to defendant's views. *Held*, that they should be construed in accordance with the natural meaning of the language used, rather than defendant's actual intention as testified to subsequently, that they were calculated to influence the action of the judge in the suit and to obstruct the administration of justice, and constituted a "contempt" punishable by the court, under Judicial Code (Act March 3, 1911, c. 231) § 268, 36 Stat. 1163 (U. S. Comp. St. Supp. 1911, p. 237).

[Ed. Note.—For other cases, see Contempt, Cent. Dig. §§ 1-3, 5, 7, 8; Dec. Dig. § 2.*

For other definitions, see Words and Phrases, vol. 2, pp. 1489-1492; vol. 8, p. 7614.]

Proceeding for contempt by the United States against W. A. Huff. Defendant adjudged in contempt.

O. D. Street, of Guntersville, Ga., and Arthur H. Codington, of Macon, Ga., for plaintiff.

T. S. Felder, of Atlanta, Ga., for defendant.

GRUBB, District Judge. This matter arose out of an attachment issued by the District Court for the Southern District of Georgia against the defendant, W. A. Huff, upon an order of the court charging the defendant with contempt in having written and delivered to the District Judge for the Southern District of Georgia two letters, which were filed by direction of the judge as part of the record of a cause in equity in which the defendant in this proceeding was one of the defendants, and certain of his creditors were plaintiffs, which was entitled on the docket of the District Court, to which it had been transferred from the Circuit Court, Wm. A. Bidwell et al. v. W. A. Huff et al. The letters were written and delivered during the pendency of the equity cause. The order of the court in the equity cause, upon which the attachment was issued, recited certain facts attending the delivery of the letters, quoted from their contents, and directed the issuance of the attachment and of a rule to be served upon the defendant directing him to show cause why he should not be punished for contempt because of the writing of the letters. The defendant appeared in response to the rule, and by his counsel demurred to the proceedings. The District Judge for the Southern District of Georgia overruled the demurrer and required the defendant to answer the rule. The defendant thereupon filed his answer to the rule, and the District Judge then stated that he would call in another judge to try the cause on its merits, and continued the cause for that purpose. Another District Judge was designated to sit in the cause, and upon the calling of the case for trial before him the United States intervened, through its law officers, and filed a motion in the proceeding in the name of the United States, asking the punishment of the defendant for the alleged contempt. The proceeding was thereupon tried upon this motion, in the name of the United States as plaintiff, as a criminal proceeding, and conducted thereafter as a separate cause

from the original creditors' bill, in which the contempt proceeding had its inception.

[1] The defendant moved to dismiss the proceeding because it was entitled in the equity cause, and was a branch of it, and therefore a civil and not a criminal proceeding in form, while the relief asked was entirely punitive in nature. It was conceded upon the hearing that the proceeding was criminal and not civil in fact (Gompers v. Buck Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. [N. S.] 874), and should be so in form. The contention of the government was that it was made criminal in form by the intervention of the United States as plaintiff, and the filing of the motion, and that this cured the impropriety, if any existed, in the form the proceeding originally took. The order of the District Judge, by which the proceeding was instituted, was no more than an order for the issuance of the process by which the defendant was brought into court to answer for the alleged contempt, and served its purpose when the defendant appeared for that purpose. It might have been more regular to have docketed the proceeding separately from the equity cause, and on the criminal side of the docket. The ultimate character of the proceeding was not determined beyond recall by the form of the order directing the process to issue. When the United States became the plaintiff, and filed a pleading appropriate to make the proceeding a criminal cause, and it was conducted as such thereafter during the entire hearing, the rights of the defendant were fully protected, and he was fully informed by the government's intervention and motion that he was being called upon to answer a criminal contempt; and the motion in itself, and by its reference to the original order, fully informed him of the nature of the accusation, which was the basis of the proceeding. The motion to dismiss is therefore overruled.

[2] The defendant also filed a plea of former jeopardy, based upon the conceded facts that upon the appearance of the defendant in answer to the attachment a hearing was had, upon a demurrer to the proceeding interposed by the defendant, and upon its being overruled the defendant was required to put in his answer to the rule, after which the cause was continued. Jeopardy does not arise until a tribunal has been duly organized competent to try defendant upon the merits, and a trial on the merits is entered upon. A hearing of a demurrer to the indictment of itself is insufficient, as is the arraignment and plea of the defendant. It requires in addition at least the impaneling and swearing of the jury. In this proceeding there was a hearing upon the law only, and what was equivalent to the arraignment and plea of the defendant, and no more. The trial was to be a nonjury one. No witnesses were sworn, and no trial on the facts entered upon, and the minute entry shows that no trial upon the facts was contemplated at that time; the District Judge reciting that he intended to call in another District Judge to try the case on the merits. Jeopardy cannot be predicated on such a record, and the plea is insufficient.

[3] The defendant then filed a sworn answer admitting the authorship and delivery of the letters, the basis of the proceeding, but denying the intent to commit a contempt, and asked to be discharged from the rule, upon the ground that he was purged, by his sworn denial, of the contempt. The federal courts do not recognize the common-law rule of purgation, and leave the question of the commission of the contempt to be determined by the proof adduced upon the hearing. The defendant's application to be discharged on his sworn answer is denied. In re Savin, Petitioner, 131 U. S. 267–279, 9 Sup. Ct. 699, 33 L. Ed. 150; U. S. v. Shipp, 203 U. S. 563–575, 27 Sup. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265; United States v. Anonymous (C. C.) 21 Fed. 761–767; Kirk v. U. S., 192 Fed. 273–279, 112 C. C. A. 531.

This brings the case to the merits. It was conceded in argument that the letters, the delivery of which to the District Judge constituted the alleged contempt, would, if delivered to the judge in open court, have been sufficient in their nature to place the defendant in contempt. The letters were not, however, delivered to the District Judge in open court, but at his house, and at a time when it is not shown that court was being held there, though the evidence tends to show that it was customary for the District Judge to hear matters in chambers in the room of his dwelling in which delivery of the letters may be inferred from the evidence to have occurred. The inquiry, then, is whether the delivery of letters, concededly so improper in the nature of their contents as to constitute contempt in other respects, when delivered to the judge at his home and at a time when he was not engaged in holding court, can be said to be contempt of the court over which the judge presided.

Under the Judiciary Act of 1789 the federal courts were vested with power "to punish by fine or imprisonment, at the discretion of said court, all contempts of authority." Congress did not define what acts constituted contempts, but left this, as well as the amount of punishment, to the judicial discretion of the courts. Prior to 1831 the judges in several cases had punished criticisms of themselves or their decisions, published in the press, as contempts of their authority, and to such an extent had this action been considered a usurpation by the public that impeachments had been instituted on account of such acts against several of the judges. The impeachments failed, but resulted in the passage of the act of March 2, 1831, by Congress, which limited the acts for which the courts might thereafter punish for contempts of their authority to defined classes, viz.: (1) Misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice; (2) misbehavior of any of the officers of the courts in their official transactions; and (3) disobedience or resistance of the orders of the court by any officer, juror, witness, party, or other person. Section 1, Act March 2, 1831, 4 Statutes at Large, 487; Revised Statutes, § 725 (U. S. Comp. St. 1901, p. 583); Judicial Code, § 268.

The acts relied upon by the government in this case bring it, if they constitute contempt at all, within the first subdivision, and no

other. They are not disobedience of the court's orders or misbehavior of its officers. If contempt, it must be because they constitute misbehavior, either (1) in the court's presence, or (2) so near to the court's presence as to obstruct the administration of justice. The letters having been delivered to the judge while the court was recessed and not in the courtroom, but in a room of the judge's dwelling, which was at most but occasionally used for the purpose of a courtroom, and was not being so used upon the occasion of the delivery of the letters, and which was at a remote distance from the courtroom, it cannot be said that the acts relied upon as constituting the contempt—i. e., the delivery of the letters—occurred in the presence of the court. The presence of the court is limited, as to place, either to the room in which the sitting is being held or the building of which the room is a part, and the vicinity so near it as to be within the range of vision and hearing, and as to time to occasions when the court is in session, or is about to sit, or has just arisen. Giving to "the presence of the court" its widest latitude, it is clear that the facts of this case do not present a case within its true meaning.

[4] It remains to be determined whether the delivery of the letters by defendant constitutes a contempt of the authority of the court committed so near to its presence as to obstruct the administration of justice. The meaning assigned the last clause of the first subdivision by the defendant's contention, is so near in point of distance to the place of holding court as that the acts of misbehavior can reach and disturb the physical senses of those concerned in holding the court and obstruct thereby the due administration of justice. On the other hand, the government emphasizes the quality of the act as to its being obstructive of the administration of justice, without regarding the place of its commission as important, except as it may reflect upon the existence of this quality. The solution of this case depends largely upon which is the correct construction of the statute.

The nature of the abuse which the restrictive statute was intended to correct throws light upon its proper construction. Prior to its enactment, as stated, federal judges had inflicted punishment for contempt based upon improper criticisms of their conduct and decisions, published after the cases had been finally determined. This had been resented, and the judges had been impeached therefor. The impeachments had failed because under the Judiciary Act the judges were clothed with discretion to decide what constituted contempts of their authority. This was the mischief which Congress intended to remedy by the act restricting contempts to defined classes. Congress was evidently of the opinion that the subjecting of judges to criticism in the press, if it did not obstruct the administration of justice, was of advantage to the judges, and that the citizen should not be punished therefor. The limitation to this was that (1) the criticism should not be administered in the presence of the court, and (2) that its tendency should not be obstructive of the due administration of justice. The judge was deprived by the act of all immunity from outside criticism which affected him only as an individual. The court and the judge, as an arm of it, was still carefully protected by the act

from all criticism that interfered with or obstructed the proper administration of justice by it. On the one hand, Congress determined that criticism of a judge that related to no litigation in his court, or such as related only to such litigation as had been finally disposed of, was not so directly obstructive of the administration of justice as to form properly the subject of a charge of contempt. On the other hand, Congress determined that the expression of criticism of the judge or of his decisions in the presence of the court and during its sessions was misbehavior in itself, though in its nature not otherwise directly obstructive of the due administration of justice, since it was in its tendency destructive of the order necessary to enable the court to accomplish its business.

Congress also recognized that there might be acts of misbehavior directly obstructive to the proper administration of justice, but which were not committed in the presence of the court, and it was to provide for this class that the second clause of the first subdivision was placed in the act. "So near the presence of the court as to obstruct the administration of justice" applies to all acts of misbehavior whose natural tendency and effect is to interfere with the administration of justice, wherever the acts may be committed. The test of the requisite nearness is made by Congress to depend upon the effect of the act upon the administration of justice. If obstructive of it in fact, it will be held to have been committed near enough the presence of the court to come within the meaning of the act. The locality is important only as reflecting upon whether the misbehavior is or is not obstructive. Criticism or abuse of the judge, though administered to him out of the presence of the court, if obstructive of the administration of justice, may, like other acts of misbehavior, be contempt of the court's authority. If relating to litigation pending before him, and intended or calculated to influence his action or decision with reference to it, they are clearly obstructive of the due administration of justice, and so are committed near enough the presence of the court to obstruct justice within the meaning of the statute.

The act has been given this construction by the weight of authority in the federal courts. In the case of Savin, Petitioner, 131 U. S. 267, 9 Sup. Ct. 699, 33 L. Ed. 150, appellant and contemnor approached a witness in the witness room adjoining the courtroom, with the intent to corruptly deter him from testifying on behalf of the government. This was held to be a contempt committed in the court's presence, though it happened out of the courtroom and not within the hearing or vision of it. If the words "so near the presence of the court as to obstruct the administration of justice" be accorded no broader meaning than that given them by defendant in this case, then it is clear their presence in the act is meaningless and futile, since that meaning is held by the Supreme Court in the Savin Case to be already included within the preceding words of the act, "in the presence of the court," and it ought not to be presumed that Congress intended the former words to have no added significance, or that it used them without purpose. If they have an added significance, it must be that they include all acts of misbehavior calculated to obstruct the administration of

206 F.—45

jústice, even though they may be committed out of the presence of the court and regardless of the place of their commission. In the Savin Case the Supreme Court declined to expressly decide whether the words "so near thereto as to obstruct the administration of justice" referred "only to cases of misbehavior outside of the courtroom, or in the vicinity of the court building, causing such open and violent disturbance of the quiet and order of the court while in sesson as to actually interrupt the transaction of its business," because it construed the acts of the appellant as having been committed in the presence of the court, which rendered a decision of the other question unnecessary. The implication, however, from what they did decide, is persuasive of their opinion with regard to what was left undecided. The same question was also left undecided in the case of Cuddy, Petitioner, 131 U. S. 280, 9 Sup. Ct. 703, 33 L. Ed. 154, and has not been decided by that court in any more recent case, unless inferentially in the case of U. S. v. Shipp, 203 U. S. 563, 27 Sup. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265.

In the case of U. S. v. Anonymous (C. C.) 21 Fed. 761, it was held to be a contempt, within the meaning of section 725, to use violent and abusive language to an examiner of the court after he had left his office and was upon the street. In that case the court cited many instances of acts held to have been contempts, though committed out of the presence of the court, and said with reference to the effect of the restrictive act of 1831 on the power of federal courts to punish for contempts:

"The next contention of the respondent is that our Act of Congress of March 2, 1831, c. 99 (4 St. at Large, 487; Rev. St. § 725), has deprived the court of the power to punish for such contempts as that alleged against him. It is generally understood that the object of that statute, which has been substantially enacted in Tennessee (Code 1858, § 4106) and other states, was to enlarge the liberty of criticism by the press and others by curtailing the power to punish adverse comments upon the courts, their officers, and proceedings, as contempts which tend to impair respect for the tribunal, and thereby obstruct the administration of justice. * * * I do not find it necessary to go into the distinctions between direct and constructive contempts, which are so unsatisfactory to all who study this subject. There is always a struggle to relegate every contempt to the odious category of constructive contempts, in order to take shelter under these restrictive statutes. But I may say that in my judgment the courts will find that the Legislature has not taken away any valuable power, when these statutes are properly understood. Notwithstanding the seemingly formidable array of authority, it may be that, after all, it is a mistake to say that all contempts not committed in the presence of the court are constructive only. The mere place of the occurrence may not be an absolute test of that question, and it may depend on the character of the particular conduct in other respects, besides the place where it happens. To print hostile comments on the court, its officers, or proceedings, as in cases where the question generally arises, or to ride one's horse into the tavern where the judge sleeps, as in Com. v. Stuart, 4 Va. 320, may be only constructively a contempt, as it very indirectly obstructs the course of justice, if at all; but where it takes the form of an assault upon an officer, as when he was beaten and made to eat the process and its seal, as in Williams v. Johns, 2 Dick. 477 (s. c., 1 Mer. 302, note d), the impediment to the efficient administration of justice may be quite as direct in its operation to that end, happen where it may, as if the party had ridden his horse to the bar of the court and dragged the judge from the bench to beat him. Com. v. Dandridge, 4 Va. 408; People v. Wilson, 64 Ill.

195 [16 Am. Rep. 528]. Be this as it may, wherever the conduct complained of ceases to be general in its effect, and invades the domain of the court to become specific in its injury, by intimidating, or attempting to intimidate, with threats or otherwise, the court or its officers, the parties or their counsel, the witnesses, jurors, and the like, while in the discharge of their duties as such, if it be constructive because of the place where it happens, because of the direct injury it does in obstructing the workings of the organization for the administration of justice in that particular case, the power to punish it has not yet been taken away by any statute, however broad its terms may apparently be."

In the case of In re Brule (D. C.) 71 Fed. 943, the court said:

"Bribing a person, who is known to be a material witness in a pending cause, to hide himself and remain away from the court, thereby preventing his testifying in such cause, is a contempt of court, whether such person has been subpœnaed or not, and though punishable by indictment, under Rev. St. § 5399 [U. S. Comp. St. 1901, p. 3656], is also punishable under Rev. St. § 725, as a contempt committed by misbehavior 'so near' to the court 'as to obstruct the administration of justice,' though the act is done at the residence of the witness, at some distance from the courthouse, in the town where the court sits."

In the case of Ex parte McLeod (D. C.) 120 Fed. 130, the District Court for the Middle District of Alabama decided that one who committed an assault upon an examiner of the court away from the court-house, because of the discharge of his official duties, was guilty of a contempt. The court said (page 141):

"Is not the judge 'so near' to the court that whatever unlawfully influences him unlawfully influences the court?"

And again (page 142):

"If the people of a distant locality, frenzied by opposition to a particular law, should band together to prevent a United States commissioner being stationed among them, and drive him away by force, the place of the occurrence would be immaterial, in determining the character of the offense, no matter how far distant from the sittings of the court. Such lawless acts would certainly not disturb the sittings of the court or interrupt the orderly dispatch of its proceedings; yet the direct effect, in law and morals, would be as obstructive of justice as if the same lawless assembly had snatched prisoners from the hands of the marshal, or kidnapped witnesses to prevent their going before the grand jury, or, for that matter, arrested the judge himself, when found miles away from the courthouse, and detained him by force, to prevent his holding the next session of the court. No one would doubt the power to punish such acts as misbehavior 'so near to the court as to obstruct the administration of justice,' for they arrest or disturb the powers of the court as effectually as when done in the very presence of the court."

In the case of Kirk v. U. S., 192 Fed. 273, 277, 278, 112 C. C. A. 531, 535, 536, the Circuit Court of Appeals for the Ninth Circuit decided that the corrupt solicitation of one who was to become a juror, at a place three blocks from the courthouse, was an act of contempt within the meaning of section 268 of the Judicial Code. The court said:

"The acts of the plaintiffs in error, which are established by the proofs herein, occurred several blocks distant from the place where the court was held, and not upon property belonging to the United States, or occupied or used by the court. The question is: 'Were they committed so near to the presence of the court as to tend to obstruct the administration of justice therein?' Section 725 of the Revised Statutes was adopted by the act of

March 2, 1831 (U. S. Comp. St. 1901, p. 583), immediately following the conclusion of proceedings against District Judge Peck, who was impeached for imprisoning an attorney for criticism of one of his decisions after the case had ended in his court. It was the purpose of the act to limit the power of federal courts to punish as for contempt criticisms of judicial decisions or judicial officers, and it seems clear that the limitation expressed in the words, 'so near thereto as to obstruct the administration of justice,' was meant to apply more particularly to that class of contempts and to acts of turbulence and disorder committed, not in the presence of the court, nor so near thereto as to present an obstacle to the orderly administration of justice, and not to misbehavior which, at whatever place committed, would tend as completely to obstruct the administration of justice as if committed in the immediate presence or in the vicinage of the court. It is obvious that any willful attempt improperly to influence jurors in the impartial discharge of their duties in a pending case, whether by attempts to bribe or otherwise, no matter where it is committed, is sufficiently near to the presence of the court to tend to obstruct the administration of justice. It is not to be supposed that in enacting the statute Congress intended to deprive the federal courts of the power to deal summarily with persons who are attempting to corrupt jurors who have been called to decide pending cases, for without that power the courts would be practically helpless in the presence of an organized scheme, such as is shown by the evidence in this case, for the purpose of interfering with the administration of justice. There is every reason why the court should have the power to deal with such attempts at their very inception, so as to prevent the evil, and should not be confined to the remedy by indictment to punish such acts after the evil has been accomplished."

In the case of In re Steiner et al. (D. C.) 195 Fed. 299, the District Court for the Southern District of New York, said:

"Upon consideration of the arguments presented at the rehearing, I am satisfied that there was error in the decision filed February 2, 1912, holding that the various acts complained of were not committed in the presence of the court, or so near thereto as to obstruct the administration of justice. The opinions cited—Ex parte Savin, 131 U. S. 267, 9 Sup. Ct. 699, 33 L. Ed. 150, and Kirk v. U. S., 163 U. S. 49, 16 Sup. Ct. 911, 41 L. Ed. 66—are persuasive to a contrary conclusion. There is no essential difference between 'obstructing the administration of justice,' by tampering with a juror or a witness, or by preparing, verifying, and securing the presentation of a false affidavit, intended to influence the action of a court."

The affidavits were verified before a notary public outside of the court room and building.

In the case of McCaully v. United States, 25 App. D. C. 411, the court said:

"There is no possible difference between the corrupt solicitation of a juror at the courthouse door, or in the corridors of the courthouse, or in some obscure nook of the building, and a precisely similar corrupt solicitation at the home of the juror or the place of business of the corrupter. The offense is no greater in the one case than in the other, and its influence upon the administration of justice is precisely the same in both cases. We cannot think that, in the enactment of the statute in question, Congress had any intention to institute a topographical discrimination between acts which have no possible relation to the matter of greater or less distance from the courthouse."

The state of Georgia has a statute (Code 1882, § 4711) substantially like the act of Congress of March 2, 1831. Under this statute the Supreme Court of Georgia in the case of Baker v. State, 82 Ga. 776, 9 S. E. 743, 4 L. R. A. 128, 14 Am. St. Rep. 192, held a party to a pending suit to be in contempt because of remarks made to the judge

in presence **of** certain jurors about a pending case during a recess of the court, and before it convened in the morning, following the recess, but in the courtroom. The court said:

"The conduct imputed to Dr. Baker as a contempt of the city court of Cartersville took place in the courtroom, during the time appropriated to the regular sitting of the court, at September term, 1888, but in the recess of the court for necessary rest and refreshment; business having been suspended the previous afternoon or evening, and the time appointed by the judge for resuming business in the morning not having arrived by six or seven minutes. The matter of the time will, perhaps, be put in the truest light by saying that, the previous day's work having been concluded, the court adjourned over to a stated hour next morning, and the misbehavior occurred from five to seven minutes before the recess expired. The judge had arrived, and was in attendance for the purpose of resuming and proceeding with judicial business, part of which was to conclude an unfinished trial. Some of the jurors who had been impaneled for the week were also present. Dr. Baker, himself a suitor in the court, was there to inquire about or look after his case. The place was the temple of justice, the time was term time, and the business in contemplation by the judge, jurors, and party was court business. Dr. Baker then and there entered upon the subject of his case, and insisted on discussing it, on making remarks about it to the judge, and in the presence and hearing of the jurors. What right did he have to do this if the court was not in session? And what right did he have to do it in an improper manner if it was in session? It was urged in argument before us that he was merely complaining to the judge, and in so doing was in the exercise of a legal right. But what law confers on a suitor the right to converse about his case with the judge out of court? Are the state's judges to be questioned by suitors about their cases, and listen to complaints, elsewhere than in court? We think not. The office of judge would be intolerable to the holder, and degrading to the state, were the incumbent subjected by law to personal and private approach, questioning, and harassment at the will of anxious and discontented suitors. The only place for intercourse with a judge touching business pending in court is the place where the court sits, and the only time for it is during the sitting. And we think that whenever a judge of the city court is in the courtroom during term, and a suitor there calls upon him to deal in any manner with, or answer questions concerning, a pending case, the court is in session respecting that case, to the extent, at least, of keeping the suitor in order in discussing it or making remarks about it, and that any misbehavior of the party then and there occurring takes place in the presence of the court, within the spirit and meaning of the statute above recited. * * * The court is not dissolved by a mere recess; and misbehavior affecting public justice in the courthouse and in the immediate presence of the judge, especially by a suitor, is misbehavior in presence of the court, and may be punished summarily as a contempt of court. * * * We think, however, that necessary adjournments from day to day are but recesses in the sittings, and that when the judge returns to the courtroom to resume business the court at once has 'a presence,' and that disorder, then and there committed, affecting the public justice or business of the court, is misbehavior in presence of the court."

That court held that improper communications made to the judge by a party to a cause pending in his court, though the court was not in formal session when they were made, may constitute a contempt of court, if they tend to obstruct the due administration of justice. The presence of the judge in the courtroom, at a time when the court is adjourned, is not to be distinguished from his presence in a room at his dwelling, where he customarily held court in chambers, though court was not being held at the time the alleged act of contempt occurred. The vital fact is that the judge had in his breast at that time

and place the case to which the improper communications related, just as he had them there the next morning, when in the courtroom and while court was in formal session. The tendency to obstruct justice was the same in either case, since the effect of the communication upon the judge was the same, in whichever place the communication was received by him.

In the case of United States v. Zavelo (C. C.) 177 Fed. 536, the court held that the privilege of a witness to be exempt from service of process in a civil cause, while attending court as a witness and until a reasonable time had elapsed for his return home, was for the protection of the court, rather than that of the witness, and should have an extent equal to the necessity for the protection, and the protection to the witness being as necessary to preserve the efficiency of the court, when the witness was out of the courtroom, during a recess of the court, as when within it, the violation of it by the willful service of civil process on the witness, away from the courtroom, but while he was still detained in attendance upon the court, was a contempt of the authority of the court, within section 725, Rev. St. U. S. The second paragraph of the syllabus is as follows:

"Where witnesses were brought by the United States to testify in a criminal proceeding from another state, and duly subpœnaed, and after the termination of the proceeding they were served with civil process by the acquitted defendant in an action for malicious prosecution growing out of their testimony, such act constituted a 'contempt' of court, within Rev. St. § 725, limiting the jurisdiction of the federal courts to punish a misbehavior committed in the presence of the court or so near as to obstruct the administration of justice, though the service was not in the courtroom nor in its immediate vicinity; the court's power being construed to extend as far as necessary to the protection of the witness."

The defendant principally relies upon the cases of Cuyler v. Atlantic & N. C. M. Co. (C. C.) 131 Fed. 95, and In re Griffin (City Ct. N. Y.) 1 N. Y. Supp. 7. In the first a newspaper criticism of a past act of a judge was held insufficient as the basis of a contempt proceeding under section 725, Rev. St. U. S. Some of the language of the Circuit Judge is inconsistent with the authorities heretofore cited. On page 99 of 131 Fed., however, the court said:

"There may be instances where the publication of editorials or other matter in newspapers would bring the author within the limitations of the statute. For instance, if a newspaper editor should publish an article concerning a trial which was being considered by a jury, and should send a copy of the paper containing such article to the jury, or a member thereof, during the progress of the trial, for the purpose of influencing them in their deliberations, it would present a question whether such conduct would not be misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice."

The second case (In re Griffin [City Ct. N. Y.] 1 N. Y. Supp. 7) is like this case in its facts. The statute of New York under which the proceeding was had differs from the act of Congress in that it restricts the misbehavior upon which a contempt proceeding may be based to "insolent behavior towards a court, committed during its sitting," while the language of the act of Congress is "misbehavior in the presence of the court or so near thereto as to obstruct the administration of jus-

tice." The difference is controlling, as was held by the District Court for the Southern District of New York in the opinion of the court in the case of In re Steiner (D. C.) 195 Fed. 299–302:

"The New York authorities cited on the brief are not persuasive; the language of the state statute being different from that of section 725, Rev. St. U. S. [now section 268, Judicial Code]. There seems no good reason for confining contempts to boisterous disturbances in the courtroom."

As a result of the authorities, it would seem that under section 725, Rev. St. (section 268, Judicial Code), acts of contempt are not limited to those committed in the immediate presence or vicinity of the court while in session or within the range of its hearing or vision, that locality is not so determinative as is the obstructive quality of the act, and that an act, the natural tendency of which is to obstruct justice, may constitute a contempt wherever committed. This conclusion is essential to the efficiency and independence of the courts. The illustrations gathered from the authorities cited are convincing that without this power the courts could not maintain themselves, since many acts destructive of the independence and the very existence of the courts may be committed out of its presence and during its recess. The courts are not alone *places* where justice is administered, but as well the instrumentalities of government by which it is administered. These instrumentalities are served. as is a corporation, by officers, and can act only in that way. It is necessary to their existence and independence that they have the power of protecting their officers in the performance of their judicial duties wherever they are called upon to perform them, and punishing those who interfere with their officers in the performance of such duties. Otherwise they would soon cease to exist at all. Such officers have no privilege or protection different from their fellow citizens, except when engaged in performing the business of the court, and so far as protection is necessary to its proper performance.

The courts comprise the judges, jurors, witnesses, clerks, examiners, and marshals. Courts are in a sense present wherever any of their officers are engaged in the performance of their functions, and whether the court is in formal session for the trial of cases or not. Any interference with the executive officers of the court, while performing their duties, wherever the place, obstructs the administration of justice. Any attempt, wherever made, to induce a witness to refuse to testify, or to testify falsely, or a juror to depart from his duty, or a judge to decide unlawfully, is likewise an obstruction to the administration of justice. Such officers are all arms of the court, and, where they are performing their duties, there the court is present. Interference with the performance of such duties is an obstruction of justice, and a contempt of court within section 268 of the Judicial Code, wherever committed. This has been expressly held, as applied to jurors, witnesses, and examiners, and is equally applicable to judges. No one of these officers can predicate contempt on acts, however annoying to them, which do not also obstruct justice. Each and all of them are clothed with the court's protection, while engaged in the court's business, to the extent that a willful interference with them while so engaged is a

contempt of the court they are representing. Any other rule would so impair the efficiency of the courts as to destroy them as an independent and co-ordinate branch of the government. It cannot be assumed that Congress had this intention when it enacted the act of March 2, 1831. Its purpose was to take away from the judge the personal privilege of being exempt from public criticism, when such criticism had ceased to be obstructive to the proper administration of justice, and to place him, so far as related to his personal privilege, in the same attitude in this respect as are his fellow citizens.

The language of the act expresses the purpose, and as well the limitation. In the execution of this purpose, Congress showed an equal solicitude to protect the liberty of the critic and to preserve the administration of justice from obstruction or impairment. Criticism of a judge relating to no matter before him for decision obstructs the administration of justice remotely, if at all. Criticism of his decision, after a case has passed finally beyond his control, has no greater effect. The harm done by such criticism is to the judge as an individual and not to the court, or to the administration of justice by it. On the other hand, criticism or abuse of a judge, regarding a case pending before him for decision, brought to the attention of the judge by a party to the case, and which is intended to or calculated to influence or affect him in the decision of the pending case, directly obstructs and embarrasses the administration of justice, in addition to the personal annoyance it causes the judge. The former classes of contempt were removed by the statute from the jurisdiction of the courts. The latter were left undisturbed.

Congress purposely left to the courts the inherent power to inflict their own punishment for improper or corrupt approaches and communications addressed to their officers, including judges, jurors, witnesses, and examiners, with intent to or calculated to influence them in the decision of matters submitted to them, for the reason that no court could maintain its authority, if it was remitted to another tribunal to protect itself, when its integrity was so assailed. The remedy by indictment provided for by the second section of the act of March 2, 1831 (Rev. St. § 5399; Criminal Code, § 135 [U. S. Comp. St. Supp. 1911, p. 1628]), is cumulative, and not exclusive. Its scope is limited to improper approaches that succeed in obstructing justice, and it leaves unprovided for the vastly greater number of such approaches, equally reprehensible, that fail to succeed, unless they be held to come within the first section of the act, as contempts of the authority of the court committed so near the presence of the court as to obstruct the administration of justice. The omission of Congress is a pregnant one, and persuasive of its belief that such unsuccessful attempts could be punished by the court itself under the first section of the act, and in a summary manner.

[5] Coming to apply these principles to the facts of this case: The letters in this case were sent by the defendant to the judge, indicating an intention to reach him directly. The letters contained a statement that they were also to be published in the press, but this itself was in the nature of a threat to the judge. At the time of their delivery to the judge, there was pending in the District Court the case of Bidwell

v. Huff, about which the letters related. The case was yet undisposed of. It was a creditors' bill, under which a part of the property of the defendant and of his children had been subjected to the payment of his debts by judicial sale. Part of the property had been sold, and some remained unsold. No decree of distribution of the proceeds of that which had been sold had been passed by the court, at the time of the receipt of the letters by the judge. There was then pending before him, for confirmation, the master's report, providing for the distribution, and exceptions to the report generally, filed by defendant individually and as trustee for his children, and by his children, and also exceptions filed by the same parties to a report of the master allowing one of defendant's attorneys a fee of $3,000, to be paid out of the proceeds in the registry of the court, and also exceptions filed by the Scottish-American Mortgage Company, a codefendant, to the same report. The defendant and his children had applied to the court to restore to them the unsold property. This application was pending before the court when the letters were sent, and was afterwards acted on adversely by the judge. The Scottish-American Mortgage Company had applied to the court for an order directing its judgment to be paid immediately out of the proceeds in the registry of the court, and the defendant filed objections to the granting of this relief. This application was also pending before the court at the same time. The decree of distribution was passed by the court on May 1, 1913, almost a year after the receipt of the letters.

The defendant contends that he believed his interest in the case had been eliminated, upon the coming in of the master's report. However, the master's report showed a surplus coming to him, unless absorbed in costs and counsel fees, the incidence and amount of which were still being contested. Nor did the defendant, for himself or for his children, acquiesce in the findings of the master. He complained, among other things, that interest was allowed the creditors, since the filing of the bill and while the proceeds of the sale of his property were deposited under order of the court in a friendly bank without drawing interest. The judge was to be called upon to pass upon the question of its allowance, and in fact did so thereafter by confirming the master's report in that respect, over defendant's exceptions which presented this question. The taxation of costs was still in dispute at the time of the delivery of the letters, and was settled by the court's decree confirming the master's report and distributing the fund. The decree of distribution passed May 1, 1913, did not terminate the litigation. The jurisdiction of the court over the cause and of the unsold property was expressly retained by its terms for future orders or decrees. It is quite clear from this review of the record in the equity cause that it was still pending before the court and in a manner which left in the defendant for himself and for his children a substantial interest. If defendant, in espousal of the rights of his children, made a communication to the judge calculated to influence or embarrass his future rulings in the cause, this would constitute contempt as much as if made in his own interest.

The letters were consequently communicated by defendant to the judge about a cause still pending before him, and in which he was still required to take judicial action substantially affecting the rights and interests of the defendant and his two children. Were they of a nature calculated to influence or embarrass the action of the judge as to the future conduct of the cause? The defendant's contention is that they were merely the indiscreet and improper expressions of a disappointed litigant, and were not intended to influence the future action of the judge, either by persuasion or intimidation. The defendant in his testimony denies that he had any such purpose in writing them, and relies upon the abusive contents of the letters to show that he could have expected to gain nothing from their delivery. The motive of the defendant is but a circumstance in reaching a proper conclusion. The intent of the defendant is to be deduced also from the contents of the letters, and if their language is such that they would be naturally calculated to influence or embarrass the person to whom they were addressed in taking judicial action, the intent of the writer to accomplish what his conduct necessarily leads to may be inferred.

Much of the objectionable parts of the letters is devoted to personal abuse of the judge, either generally or because of his past actions in the pending equity cause. The writing of such a letter by a party to a pending cause to the judge, who is called upon to decide the cause, would seem calculated to embarrass and obstruct the administration of justice. Persuasion is not the only way in which the decision of a judge may be influenced. The willful arraying of a judge in hostility to a party to a case to be decided by him, by writing an abusive letter pending its decision, is well calculated to interfere with that impartial consideration of the cause by the judge which the law contemplates. Whether such a letter would cause the judge to lean unduly to or away from the writer will depend upon the temperament of the judge and seems of little consequence. If it disturbs his equipoise as between the parties, it obstructs and interferes with the administration of justice, without regard to which way it causes him to lean. Letters of the character of those written by the defendant are calculated to accomplish the perversion of justice in this way, and the fact, if it be a fact, that they were not written with that motive, or that, by reason of the temperament of the judge to whom they were written, no such result ensued in the particular case, cannot change the conclusion that they are contempts of the authority of the court over which the judge presides.

The letters, however, are not confined either to general abuse of the judge or to criticism of his past actions in the equity cause. There are many references contained in them relating to action to be taken by him in the future conduct of the cause, which are of a nature calculated to influence such action. When the letters were delivered, there were at least four separate questions still to come before the court for adjudication: (1) The question of the allowance of an attorney's fee to one of defendant's attorneys, and the fixing of its amount; (2) whether interest should be allowed the creditors on their claims, after the sale of property sufficient in amount to satisfy them

fully; (3) the restoration of the unsold property to defendant and his children; and (4) the taxation of costs as between the parties. Each of these questions had been presented for decision to the judge by defendant's exceptions to the master's reports, which were on file. There are references in the letters to three of these questions, and to the possible action of the judge in respect to them, accompanied with what may fairly be construed as implied threats on the part of the defendant if such action did not conform to the right as defendant saw it. It is only necessary to refer to one. In relation to the application to restore the Armory property, which was unsold at the time of the delivery of the letters, the defendant wrote in the letter addressed to the judge personally:

"My son Edison tells me that, when the petition for the return of the Armory property was presented to you in court, you modestly inquired if there was any ammunition in it. My lawyers were, of course, too prudent to answer your question, and I will do it for them. There is ammunition in the Armory lot petition. It is full of dynamite, and when you return to Macon next fall, and order that property sold, the explosion will take place."

This is clearly a reference to future action to be taken by the judge, and a threat in the event such action did not conform to defendant's views as to what was proper. The letter also contains a reference to possible impeachment proceedings, and threatens to publish the two letters broadcast and to express copies of them to the President, Cabinet members, and judges of the Supreme Court. Such references can be fairly construed only as intended as a species of intimidation. It is true that the defendant testified that he neither would have nor could have made use of them for the purpose of intimidation, and it may be conceded that such was not his conscious motive. But, in spite of his testimony, the language of the letters can bear no other reasonable interpretation, and the intent of the defendant is to be ascertained, rather by the natural and inevitable effect of his admitted acts and words, than by his subsequent disavowal of conscious motive. The tendency of the letters to obstruct the administration of justice depends upon the natural impression the reader would get from the perusal of them rather than upon the hidden and undisclosed motive of the writer. If the judge, upon reading the letter, would have been naturally led to believe he was being threatened, then the evil was accomplished. If such was the natural effect of the language used by the writer, he is presumed to have intended what his words imported, and is responsible therefor. The fact that the judge may not have yielded to the threats in the instant case is of no greater importance than would be the fact that a judge had rejected a proffered bribe, if the contempt were based on such a proffer.

The evidence is convincing beyond reasonable doubt that the defendant wrote the letters and caused them to be delivered to the judge while the equity cause was still pending, and while it still required further judicial action at his hands, substantially affecting the rights of the defendant and his children, that the letters were of a nature tending directly to obstruct the administration of justice in the equity cause, and that their writing and delivery, though it occurred at the

home of the judge, was so near the presence of the court as to obstruct the administration of justice, being near enough to reach and influence the judge, who was the arm of the court charged with the administration of justice in the particular case; and the defendant is therefore adjudged to be in contempt of the authority of the court.