RICHARDS et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. September 21, 1903.)

No. 931.

1. UNITED STATES MARSHAL—CONTEMPT—UNFAIRNESS IN SUMMONING TALESMEN.

The fact that a marshal knew a talesman, whom he subpœnaed under an open venire, to be a friend of the defendant in a criminal case, is not evidence of a willful contempt of court.

2. SAME—DISOBEDIENCE OF ORDER—EVIDENCE CONSIDERED.

Evidence examined, and *held* not to sustain a charge of contempt against a marshal for knowingly violating a verbal order of the court requiring talesmen to be summoned from the body of the district, and not from bystanders, and for conspiring to place upon the jury persons known to be friendly to the defendant on trial, and favorable to his acquittal.

In Error to the District Court of the United States for the Second Division of the District of Alaska.

The plaintiffs in error were prosecuted and convicted under the provisions of chapter 58 of the Code of Alaska (31 Stat. 429) upon an affidavit in the nature of an information charging them with contempt of court. The affidavit alleges that Frank H. Richards was the United States marshal for the District of Alaska, Second Division; that on April 17, 1902, the day on which the case of United States v. Joseph H. Wright came on for trial in said court (the said Wright being then under indictment for embezzling public funds belonging to the money order department of the Nome post office, which came into his possession as postmaster at Nome), upon drawing the jury, the regular panel became exhausted, whereupon the assistant district attorney moved for an order directing the marshal to summon talesmen from the body of the district to fill the jury; that the order was made to summon eight qualified persons to complete the jury; that in pursuance of said order the marshal summoned Geo. Shea, M. J. Sullivan, W. T. Eames, W. M. Eddy, James Gaffney, B. F. Dyer, W. A. Hayden, and W. J. Erskine. The first specific charge in the information is that in the execution of said order the marshal did not act fairly and impartially and in accordance with his official obligation, but that, in disregard of his official obligation and duty, and in furtherance of a conspiracy, combination, and confederacy with Joseph D. Jourden and Wright to defeat the ends of justice, and to unlawfully and corruptly procure a verdict in favor of said Wright, he selected and summoned persons whose names had, prior to the issuance of said order, and subsequent thereto, been given him by the said Wright, Jourden, and others on his behalf, and who were known or believed to be intimate friends and companions of said Joseph H. Wright, and favorable to his cause, and who would, if selected as jurors, render a verdict in his favor. The second charge is that Richards, Jourden, and Wright, intending to hinder the due and lawful trial of said cause, solicited and persuaded M. J. Sullivan, George Shea, W. M.

Eddy, and others to be in attendance while the jury in said cause was being impaneled, for the purpose and with the intent that, if the regular panel of the jury should become exhausted, the marshal could select them to fill the jury, well knowing them to be intimate friends of Wright, and who would, if accepted, render a verdict in his favor. The third charge is that Richards, in unlawful interference with the process and proceedings of the court, and in violation of the order of the court that the venire be selected from the body of the district, and not from the bystanders, did summon M. J. Sullivan, Geo. Shea, and W. M. Eddy, whom he knew to be bystanders and in the courtroom when the order was made, believing them to be friends of Joseph H. Wright, and persons who would render a verdict in his favor. The fourth charge is that Jourden unlawfully interfered with the proceedings of the court by soliciting and persuading James Gaffney, W. A. Hayden, and W. T. Eames to serve as jurors in said cause, and did approach said persons with the intent of influencing their action and their verdict if they were so drawn as jurors. The fifth charge is that Richards, Jourden, and Wright solicited and attempted to influence A. F. Lange, a member of the regular panel, to be favorably influenced in his deliberation toward Wright if called as a juror on said trial. The information proceeds to allege that Sullivan, Shea, Gaffney, Eddy, and Eames were summoned and qualified and served as jurors in the trial of Wright's case, and rendered a verdict of not guilty, and that, by reason of the conspiracy and the acts of the plaintiffs in error, the United States was defeated and greatly prejudiced in the trial of said cause. The evidence against the plaintiffs in error is, in brief, the following:

E. T. Eames testified, in substance, that on April 17, 1902, the date of the trial of the Wright case, he went into the Lobby Saloon, and saw there P. C. Sullivan, attorney for Wright, Mike Sullivan, Shea, Jourden, Griggs, who was one of the marshal's deputies, Hayden, and many others; that Jourden was talking with P. C. Sullivan; that he noticed that something unusual was going on; that he stepped up to Jourden and asked him what was going on, and Jourden answered that they were serving an open venire; that Eames remarked to Jourden that he had just finished serving as grand juror, and that he was eligible for trial juror; that Jourden said: "This is the case of the United States against Joseph Wright. He has not got anything. His friends are trying to do what they can for him. His lawyers, even, are getting nothing;" that Eames said to Jourden: "I think Joseph Wright is all right;" that Jourden said: "Well, I will see what I can do;" that Jourden then went over and began talking to P. C. Sullivan; that he came back, and asked Eames' initials, and put his name down on a piece of paper on which were two other names, handed the paper to P. C. Sullivan, and that Sullivan handed it back to Griggs; that Griggs then went out; that five minutes later Griggs came in and called for Mr. Hayden; that Hayden was at the roulette table, and answered to his name; that Griggs then asked for W. T. Eames; that Eames answered, "I am the man;" that Griggs handed Eames a subpœna, and Sullivan said: "You had better go right up to the courthouse. They are impaneling a jury now;" that the witness went up and was drawn upon the jury, and served.

W. A. Hayden, testified that he was in the Lobby Saloon on April 17, 1902, and there had a conversation with Jourden; that Jourden motioned him over to his desk, and asked him if he was a friend of Joe Wright. "I told him no, not especially; that I was acquainted with him. He asked me if I wanted to serve on the jury. I said I didn't mind. He asked me how I spelled my name. I told him. He wrote my name on a piece of paper. I went to the roulette table. While there I was subpœnaed by Griggs."

Frank Minto testified that he was a bartender at the Lobby Saloon on April 17, 1902, and that he saw Jourden talking with Hayden; that he saw Hayden later at the roulette table, and heard Jourden ask him what his initials were; that at about that time P. C. Sullivan, Mike Sullivan, Shea, and others, came in—quite a crowd from the courthouse; that the saloon was full; that he saw Griggs come in and serve subpœnas on Mike Sullivan and Shea, and saw Eames talking with Jourden, back of Jourden's desk; that he saw Jourden come up to the bar and talk to Griggs, and then go back to his desk, where Griggs followed him; that Griggs talked with Jour-

den there a little bit, and then went out, and in a few minutes come back, and asked who Hayden was; that some one told him who Hayden was, and he served a subpœna on him, and also served a subpœna on Eames; that the witness saw Gaffney there, but that Gaffney was not subpœnaed there.

A. C. Griggs, deputy marshal, testified that he was in the marshal's office when the order was made for an open venire for eight jurors; that subpœnas were made out for Shea, Dyer, Gaffney, Sullivan, Butler, Erskine, Seiffert, and Woodruff; that Deputy Bouse and himself prepared the subpœnas; that he (Griggs) served four of the men so named; that he served Shea and Sullivan in Jourden's saloon, and Dyer and Gaffney at their places of business; that Bouse served Erskine and Eddy; that Bouse scratched out the name of Seiffert, and put in Eddy, because he could not find Seiffert; that the witness first served Shea and Sullivan at the Lobby Saloon, and then went out and served Gaffney and Dyer; that, not knowing whether Bouse would find his men, the witness, as he left the saloon, after serving Shea and Sullivan, had asked Jourden if he knew of any good men to serve as jurymen in case they ran short on the venire; that Jourden hesitated, and then said: "There are some men who wanted to serve on the jury this winter and get the four dollars. There are two men here I think we can get;" that the witness asked who they were, and Jourden said they were Eames and Hayden; that the witness took a memorandum of the two names, and went right out, and served Gaffney and Dyer; that, coming back, he went to the recorder's office, and telephoned to the marshal's office, and asked if Bouse had got back and had got his men, and was answered that he had not returned; that the witness then returned to the marshal's office; that, as he entered, the telephone rang, and he answered it, and found it was Bouse reporting that he could not find Butler or Seiffert, but that he had found Erskine, and that he could get Eddy; that the witness then told Bouse that he knew where he (Griggs) could get two men right away; that he went back to the Lobby Saloon and served Hayden and Eames; that prior to that time he had tried to find Richards, the marshal, but he was not in his office; that the witness did not know that Jourden was a friend of Wright, but supposed he was, and that he did not know that Jourden was on Wright's bond; that the marshal did not know that Eames or Hayden were to be subpœnaed, or that they had been subpœnaed.

John Bouse testified that the subpœnas were prepared by Richards, Griggs, Forrest, and himself; that the way he came to serve Eddy was that he was not able to find Seiffert, Erskine, or Butler; that he was acquainted with Eddy, and knew where he could find him, as he was janitor at the Arctic Brothers Hall; that he did not know that Eddy was a friend of Wright; and that no one told him to put in Eddy's name.

Adam Johnson testified that he was a deputy marshal, and was court crier on April 17, 1902, and was in court when the order was made for the open venire; that he saw Shea, Mike Sullivan, and Eddy there; that he went into the marshal's office after the order was made, and saw Shea go through the marshal's office, but did not see Sullivan there; that he heard a conversation between the marshal and his deputies at the time the open venire was being prepared to be served. The district attorney then propounded this question to the witness: "Q. Now, I will ask you what that conversation was. A. Am I compelled to answer that, sir? Court: Yes, Adam; simply go ahead and tell what you heard. Tell the truth, and nothing but the truth. That is what you are sworn to tell. A. All I heard him tell Griggs was that he had some subpœna tickets. I heard him tell him to go down to the Lobby and get those parties. I don't know what parties they were. I don't know what the names on the subpœna tickets were."

W. N. Eddy testified that he was a very close friend of Wright, and that Wright had talked with him about his case, and about the evidence that he should introduce; that he (Eddy) had always believed that Wright was innocent, and that he had told Wright so, and that Wright had made the remark that he wished he (Eddy) was on his jury; that the witness was subpœnaed as juror by John Bouse, but did not have any talk with the marshal before he was served, nor with Jourden.

George Shea testified that he was within hearing of the court when the

order was made for the open venire in the Wright case; that the marshal was standing by his side, but that he had no conversation with him at all that day; that the witness started down the street to his office after the order was made, but stopped at Jourden's saloon; that on the way there he met or overtook Mike Sullivan; that they went into the saloon together, and that they were both served with subpœnas there; that it was nothing unusual for lawyers and witnesses to drop into the Lobby Saloon on their way to and from the courthouse; that the district attorney went in that time and joined them in a drink or a cigar, and was there when they were served; that the witness had no conversation with Jourden before being subpœnaed, nor with Richards, nor with any of his deputies; that he did not go into the marshal's office that morning; that when he left the courthouse, as a matter of fact, he did not know he was going to be served as a juror in that case, "but I did feel as though I was"; that Joe Wright and the witness were friends, but that there was no great friendship between them.

A. F. Lange, an undertaker, was a member of the regular panel, and a juror in the Wright case. He testified that he had a conversation with Jourden before the trial in which Jourden said he felt sorry for one man whose case was coming up. "I asked him who it was. He said, 'Wright's.' He said, also, Wright was a friend of his."

Denson & Schlesinger and Sullivan & Fink, for plaintiff in error Richards.

Marshall B. Woodworth and Melvin Grigsby, for the United States.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The record in this case is incumbered by a mass of irrelevant matter. It includes the indictment against Joseph Wright, the examination of the jurors in that case, the testimony taken before the jury, the instructions of the court to the jury, and all the orders of the court. We have nothing to do with the question of the guilt or the innocence of Wright, or the correctness of the charge of the court in his case, nor with any of the matters contained in the record in that case, save such as directly refer to the assignments of error in the case at bar.

Although the writ of error is prosecuted by both Richards and Jourden, no appearance is made in this court on behalf of the latter. All the testimony taken in the case is presented in the bill of exceptions. It fully sustains the charges against Jourden, and, so far as he is concerned, it requires no discussion. The plaintiff in error Richards concedes the rule to be that if there be any evidence whatever, no matter how slight, in favor of the judgment, no relief can be afforded by this court. But he contends that the record shows a complete absence of incriminating evidence against him. Upon a careful scrutiny of the testimony contained in the bill of exceptions, we are of the opinion that his contention is sustained by the record.

The trial court found the plaintiff in error guilty of willful disobedience to its order in the Wright case, in that he subpœnaed two of the talesmen from the bystanders, and not from the body of the district. The court found the facts to be that, when the regular panel was exhausted, Shea and Mike Sullivan were in the courtroom, and that Shea stood by Richards, and that Richards heard

the application of the district attorney to have the special venire men summoned from the body of the district, and not from the bystanders, and heard the court's allowance thereof. It appears that the order which was made by the court for the issuance of the special venire was not entered upon the journal of the court. On the trial of these proceedings against the plaintiffs in error, the district attorney applied to the court for an order in the Wright case nunc pro tunc, in accordance with his recollection of the order as it was made at the time, as presented to the court—a form of order which recited that, on an application for an order for a special venire, directing the marshal to summon from the body of the district, and not from the bystanders, talesmen to complete the jury, the court made the order as applied for. The court, however, declined to make the order nunc pro tunc on the ground that the Wright case was not then before the court. Subsequently, on the trial of the case now under consideration, it was shown on behalf of the plaintiff in error Richards that the authority under which he subpœnaed the talesmen and upon which he made his return was a certified copy of an order issued by the clerk of the court, attested by the seal of the court, addressed to the marshal, and directing him as follows:

"You are hereby commanded to summon from the citizens and bystanders eight (8) qualified persons to serve as petit jurors at the special February, 1902, term of the said court; said jurors to appear before the court forthwith."

In the certified transcript of the records in the case of The United States v. Wright, it appears that the following were the proceedings of the court in relation to the special venire:

"Mr. McGinn: I would suggest, then, that an open venire be issued for six more jurors; and I would rather have them picked from the body of the people, rather than bystanders. The Court: Any objection to that? Mr. Sullivan: We have no objection to that. The defendant has none, if the court please. The Court: Let an open venire issue for eight jurors. That will probably be sufficient."

The marshal testified that he was not in the courtroom at the beginning of this colloquy, but that, having heard it reported that the court was about to order a special venire, he went into the courtroom, and as he entered he heard the court directing that an open venire issue for eight jurors. He denies that he heard the preliminary remarks of counsel in relation to the venire, and there is no testimony in the record to the contrary, or that he knew that the district attorney had asked that the jurors be picked from the body of the people, rather than from the bystanders. Shea and Mike Sullivan were bystanders at the time when the order was made, and, if the marshal had knowledge that it was the intention of the court in making the order that no bystanders be subpœnaed, his action in placing their names on the list to be subpœnaed was a violation of the order, and was evidence to sustain one of the charges of the information. But we cannot discover, from a careful examination of this record, that there is any evidence that the marshal knew that such was the intention of the court. The certified copy which was handed him by the clerk was direct authority to the contrary. It

directed him to summon talesmen from the citizens and bystanders. We think, therefore, that there is a total failure of evidence to sustain that branch of the charges.

The other evidence upon which the trial court found the plaintiff in error guilty of the offense charged in the information consists of two items of testimony, first, that he had told his deputy, Griggs, that he had some subpœna tickets to serve, and directed him to go down to the "Lobby Saloon and get those parties"; and, second, the testimony of Eames that in the conversation which he had with Richards after the Wright trial, and after knowledge had come to Richards that Eames had been employed as a detective to look up evidence against him, he said to Eames that he had put him (Eames) upon the jury on the assurance of Griggs that he was "all right." As to this latter item of evidence, it seems clear that in making that remark, if he made it, Richards must have had reference to his own action after it had come to his knowledge that Eames had been subpœnaed by Griggs. In other words, the import of his words to Eames is: "I permitted your name to remain on the deputy marshal's return of those who were subpœnaed as jurors upon the assurance of Griggs that you were all right." It is not pretended that Richards had anything to do with the selection of Eames as a talesman. On the contrary, all the evidence of the prosecution shows that Eames was first selected by Jourden after Griggs arrived at the Lobby Saloon, and after Griggs had served Shea and Sullivan. According to Eames' own statement, Jourden's first conversation with him about his serving as a juror was had at that time, and Eames testified that he was put on the jury as the result of his own overtures to Jourden at that time. It is evident that the marshal was not, and could not have been, a party to the selection of Eames, and that he could have known nothing of it until Griggs returned to the marshal's office with the information that Eames had been served. The whole case, therefore, against the marshal, comes finally to rest solely on the testimony of the deputy marshal, Adam Johnson, who testified that Richards instructed Griggs to go down to the Lobby Saloon "and get those parties." The marshal does not deny that he told Griggs to go to the Lobby Saloon, but he adds that he told him also to go to the Golden Gate Hotel. It is not disputed that at that time the marshal had made out a list of names of eight men to be subpœnaed. It appears from the evidence that the Lobby Saloon was located near the courthouse, and that it was a place of rendezvous for lawyers, witnesses, jurors, and business men. Of the eight men whose names were selected by the marshal to be subpœnaed on the open venire, but two were in fact found in the Lobby Saloon. These were Shea and Sullivan. They were both, as we have seen, in the courthouse when the order was made. It is a fair inference from the circumstances that the marshal, seeing them there, selected them at that time, as he testified that he did; that he assumed that they would stop at the Lobby Saloon with the crowd that went from the courthouse; and that his instruction to Griggs to "get those parties at the Lobby Saloon" had reference only to Shea and Sullivan. None of the other men whose names were on

the list which the marshal had in his hand were in fact found at the Lobby Saloon. He is not charged with any misfeasance in selecting the other six men that were on the list. It is not shown or hinted in any of the testimony that at the time when the list was made out the name of either Eames or Hayden was suggested or thought of by any one in the marshal's office. All the evidence shows that Eames and Hayden were put upon the jury at the instance of Jourden, and after Shea and Sullivan had been subpoenaed, and after Griggs, the deputy marshal, had inquired of Jourden for the names of men to be suggested for talesmen. There is evidence, it is true, that the marshal knew that Mike Sullivan was a friend of Wright; that, when the district attorney subsequently accused him of misfeasance in selecting the jury, and said to him, "You knew that Mike Sullivan was a friend of Wright," he had answered, "Yes; and I also knew that he was a friend of yours." The fact that he knew that one of the talesmen whom he caused to be subpoenaed was a friend of the defendant in that action is not of itself evidence sufficient to establish the charge of willful contempt of court.

The learned judge of the court below attached importance to the fact that there was evidence to show that the marshal's deputy, Griggs, and his attorney, P. C. Sullivan, were in conference with Jourden at the Lobby Saloon in connection with the selection of Eames and Hayden as talesmen, and, in his opinion, remarked that the marshal was represented in that conference by his attorney and by his deputy. So far as it concerns the part of Griggs in that matter, there is no evidence whatever even tending to show that the marshal authorized his acts, or was cognizant of them. It is true that it appears from the record that P. C. Sullivan was attorney for the marshal in some litigation which he had had, but the fact that the relation of attorney and client existed between them cannot be given the force of direct evidence against the accused on the charges here involved. Nor does it justify the inference that the marshal was represented by his attorney in the conference at the saloon. The most that can be claimed from it is that the marshal was on friendly terms with the attorney, and that it might, perhaps, be argued that on that account he would be more disposed to aid him in an attempt to influence a jury than he would be if that relation did not exist. Such an argument might properly be adverted to in conjunction with evidence sustaining the charges. It is not to be presumed, however, that a sworn officer of a court would, at the instance of his attorney, disregard his duty, or lend himself to a scheme to subvert the ends of justice. The most that can be said of the evidence against the marshal is that, conceding it all to be true, it presents some circumstances calculated to arouse suspicion, but not sufficient to sustain a judgment of conviction of so grave an offense as that with which he is charged.

The judgment against the plaintiff in error Richards is reversed, and the cause is remanded for a new trial.