# UNITED STATES OF AMERICA, Complainant,

## *v.*

# MARIANO R. PESQUERA AND ARTHUR G. MAYO, Dfts.

---

San Juan, Criminal, No. 2975.

CONTEMPT OF COURT.

Grand Juror—Improper Interview with Official.

    1. Where the evidence is clear that improper interviews and communications were had between one member of a grand jury and an officer of the United States government, some of which communications took place within the walls of the building where the court sits, these acts constitute an obstruction of justice and render parties subject to punishment for contempt.

Contempt—Quasi-Criminal—No Jury.

    2. A proceeding for contempt against parties charged with the obstruction of justice is a quasi-criminal proceeding; and while the parties are not entitled to trial by jury, the court is bound to find them guilty of no contempt unless the facts set forth in the information are established by competent evidence so as to leave no reasonable doubt.

Opinion filed December 12, 1922.

---

*Mr. Ira K. Wells,* United States District Attorney, for the United States.

*Messrs. Hugh R. Francis, Miguel Guerra,* and *Jaime Sifre, Jr.,* for Mariano R. Pesquera.

*Mr. O. M. Wood* for Arthur G. Mayo.

ODLIN, Judge, delivered the following opinion:

On November 16, 1922, there was filed an information under oath by the United States district attorney charging the two defendants above named, Mariano R. Pesquera and Arthur G. Mayo, with contempt of this court. It is not necessary to recite at length the averments of this information, because many of them are admitted by the defendants to be true in the separate answers by them filed, and with respect to such matters as are denied or sought to be explained away the facts will appear in this opinion. It is conceded that the defendant Arthur G. Mayo was a member of the recent grand jury of this court, serving continuously from June 12 until late at night on October 21 of the present year, when said grand jury was discharged. It is also conceded that during all this period of time the other defendant, Mariano R. Pesquera, was Federal prohibition director for Porto Rico; and that on July 11 of the present year the said Mayo filed with the said Pesquera an application for appointment as prohibition agent in this Island under Pesquera.

Pesquera himself during the latter part of July believed that this grand jury was investigating his own official acts. The testimony shows that the name of Pesquera was among those mentioned during some of the meetings of the grand jury during the latter part of July, although not in connection with any direct charges against himself. But it also appears clearly from the evidence that accusations of a serious nature against Pesquera did reach this same grand jury during the month of

September, and particularly in the early part of October of the present year. Mayo in his answer, which is quite clear, specific, and direct, freely admits that he made frequent visits to the office of Pesquera, because, owing to his unemployment and lack of funds for his living expenses, he was naturally extremely eager to learn whether or not his application for appointment had been approved at Washington. Pesquera had assured Mayo long before October 19 that this application had gone forward and that he, Pesquera, was waiting to learn the result. As a matter of fact, and as Pesquera himself admits, he forwarded nothing to Washington with regard to Mayo until October 19, which was the very day upon which the grand jury took their vote as to whether or not Pesquera should be included in an indictment which was returned to the court late at night on October 21. In short, Pesquera admits that he deceived Mayo in this respect, but of course, as claimed by Pesquera's counsel, the fact that he told a falsehood to Mayo would of itself be neither perjury nor contempt of court.

Mayo insists in his answer and in his testimony that he was in no way influenced with respect to his duty as a grand juror toward Pesquera, and that he knew nothing whatever about the deceit or falsehood which had been practised upon him by Pesquera until after the grand jury had been discharged. Mayo persisted in his testimony in his assertion that there was no reason for his being influenced by the fact that he was seeking employment under Pesquera, because he supposed during all this time of his service on the grand jury that the question of his appointment or nonappointment was out of the hands of Pesquera and rested with the authorities at Washington, District of Columbia.

United States v. Pesquera.

The testimony also clearly shows that in the early part of the evening of October 21, a few hours before the indictment was brought into open court, Pesquera told another falsehood to Mayo to the effect that this appointment had been approved at Washington, and that Mayo could go to work on the first day of November. Pesquera neither admits nor denies this second falsehood, but on the witness stand testified that he, Pesquera, was so upset and disturbed in his mind that he was not sure just what he did say to Mayo. It is admitted by both defendants that no action whatever was taken at Washington until November 7, seventeen days after the grand jury had been discharged and exactly nine days before this information for criminal contempt was filed.

The question now before me is to determine whether or not there has been misbehavior by either or both these defendants in the presence of the court, or so near thereto as to obstruct the administration of justice, such as makes it the duty of this court to punish these parties, one or both, for contempt.

I accede at the outset to the claim of counsel for these defendants that no finding of guilty can be properly made unless convinced beyond a reasonable doubt that the charges set forth in the information have been established by the evidence. I feel very sure that no judge has ever presided over this court who would go further than I in protecting the rights of an individual charged with crime, and to avoid any improper conviction following testimony which failed to establish every essential element of the offence. But in protecting the rights of the individual the court must remember that the United States itself has some rights. The United States has the right to rely upon the good faith of every man serving upon a grand

United States v. Pesquera.

jury that he means to observe his oath. The United States has the right to rely upon the duty of every man in public office refraining from any attempt to corrupt or influence or mislead any number of a jury either petit or grand, no matter whether the person undergoing trial or undergoing investigation is a friend of such public official or a stranger to him or such public official himself. A moment's thought will disclose the reason. Suppose a man of great wealth or power commits a serious felony. He can be brought to trial only after a lawful indictment. In order to prevent an indictment he seeks to influence by promises or money such members of the grand jury as are weak; and suppose there were eight or ten men on such grand jury in the unfortunate position of Mayo financially, coupled with inability to realize the meaning of his oath. The criminal could never be punished and the power of the government to protect society would fall. Hence the plain duty of the court to punish men guilty of actions like those proven during the hearing recently had. To me it is extremely unpleasant that I must decide against these accused. I do so with regret. It would be much more agreeable could I see my way clear to acquit them. My careful review of the entire case forces me to a finding of guilty. And an analysis of the evidence will show why such must be.

Mayo took his oath on June 12, 1922, that he would keep secret all the proceedings of the grand jury and never disclose them except upon the order of some competent court. Pesquera claims that the falsehood that he told to Mayo was with no ulterior motive and with not the slightest intent of influencing in any way the action of Mayo with respect to the investigation against Pesquera himself, but that it was done merely to avoid

United States v. Pesquera.

the bother and nuisance of the frequent visits made by Mayo to the office of Pesquera, which office is on the third floor of this building and above the room occupied by the grand jury on the second floor. It is also insisted by both these defendants that the statement made by Pesquera to Mayo to the effect that the authorities at Washington had approved this appointment and the bringing into open court of the indictment against Pesquera himself both took place on the evening of October 21, was a mere coincidence. This is to my mind inconceivable. If I were able to bring my mind to believe this, I would acquit both of these men and stop this opinion at this point.

But the evidence in this case discloses something more. The vote of the grand jury upon this indictment was secret, by ballot, and taken on October 19. After the result of the vote was announced the only member of the grand jury who questioned it was Arthur G. Mayo. This is made clear by the testimony of the grand juror Martin, who counted these secret ballots and who testified that the vote was sixteen for the indictment and six against the indictment. No reasonable man, as it seems to me, can believe it possible that all these communications between Mayo and Pesquera were honest, sincere, and pure in intention. As soon as Mayo learned that the accusations against Pesquera were becoming so serious as to make the indictment of Pesquera possible, it was his clear duty to keep away from Pesquera or to be excused from voting on the question whether or not Pesquera should be included in the indictment.

And so far as Pesquera is concerned, it seems to me that his conduct is much more culpable than that of Mayo, because Pesquera was prosperous and occupied an important government

position, and he could have no possible motive in making these various statements to Mayo except in the hope that Mayo would be strong enough in his influence over the other members of the grand jury to keep the name of Pesquera out of the impending indictment, which Pesquera himself admits he had feared was coming and had worried about greatly for some time previous to October 21.

This court has not attempted to reach a decision in this case without the examination of many authorities. We will take up first the review of all the cases cited by the attorneys for Pesquera.

First is the case of United States v. Jose, reported in 63 Fed. at page 951. Jose was charged with an alleged contempt in interfering with property in the possession of receivers appointed by the Federal court in the state of Washington. The court there decided that Jose should not be held guilty of contempt because the proof was not clear as to the criminal intent. It is there held that accusations for contempt must be supported by evidence sufficient to convince the mind of the judge beyond any reasonable doubt of the actual guilt of the accused; also that every element of the offense, including a criminal intent, must be proved by evidence or circumstances warranting an inference of the necessary facts. This principle of law is the exact one that I am applying in the present case. My mind is convinced beyond any doubt that there was a criminal intent to obstruct the administration of justice, and that it has been proved clearly that both Mayo and Pesquera had such criminal intent.

The next case is that of Richards v. United States, 61 C. C. A. 161, 126 Fed. 105. In this case the marshal of a Federal

United States v. Pesquera.

court was charged with contempt upon the theory that he had summoned as a prospective juror a man whom he knew to be a friend of the defendant on trial for embezzlement. This trial took place in Alaska. Richards was the United States marshal. There was considerable confusion in the testimony, and the trial judge thought that such evidence showed that the action of the marshal had been intentional and for the purpose of obstructing the administration of justice. The court of appeals examined the evidence and held that it was not sufficient to sustain a charge of contempt against the marshal; therefore, the judgment finding the marshal guilty of contempt was reversed. I accede gladly to the principle upon which this decision in 126 Fed. is reached. There was serious doubt, as will be seen in reading the evidence on pages 110 and 111, as to there being any improper intention which controlled the action of Marshal Richards. In the case now on trial before me I would have to find Mayo and Pesquera both guilty on their own testimony, coupled with that of Martin.

I have examined the next case relied upon by counsel for Pesquera, being that of Stuart v. Reynolds, 123 C. C. A. 13, 204 Fed. 709. This was a bankruptcy case. The referee in bankruptcy was of the opinion that the bankrupt had failed to surrender possession of property worth nearly $20,000, and ordered the bankrupt to deliver said property or money to the trustee. The district judge, Honorable T. G. Jones of Alabama, reviewed the testimony, and came to the conclusion that it did not show the disposition of any specific goods, or trace to the bankrupt the possession of any considerable sum of money, and the order of the referee was reversed and held for naught. Thereafter the decision of Judge Jones was reviewed by the

circuit court of appeals of the fifth circuit, and this latter court decided that Judge Jones was correct in refusing to commit the accused. The opinion is a long one, but full of interest. It distinctly holds that the trial of a contempt case should be conducted according to the same rules as are observed in criminal procedure, except in the matter of a jury trial. The party charged with contempt of court must be given an opportunity to defend by informing him concerning the nature of the offense charged. Furthermore, the presumption of innocence accompanies the accused throughout the trial, and the United States, if the prosecutor, must establish the guilt of the accused parties beyond a reasonable doubt. I quote from pages 714–716. And in the case now before me I have applied the very rules, as best I know how to do, which were applied in this interesting case of Stuart v. Reynolds.

The next case cited by counsel for Pesquera is that of Jones v. United States, 126 C. C. A: 407, 209 Fed. 585. This is an interesting case and it seems that Jones signed a bail bond as surety and testified that he was the owner of certain real estate; it appeared that after he acquired title to the property and before he signed the bail bond he had executed a deed of this real estate to his own wife, but with the understanding that it should be delivered and recorded only in case that he died before she did; and it appeared that this deed did not vest in her any interest in the property, and its existence and the fact that the wife was able to produce it when she was sent home without her husband to get it did not establish beyond a reasonable doubt that the accused had testified falsely in stating that he was the owner of the property. In other words, the district judge, the Honorable Kenesaw M. Landis, who was of the

opinion that Jones was guilty of contempt, had misunderstood the legal effect of this deed executed to the wife. For this error of law the circuit court of appeals reversed Judge Landis and ordered Jones to be discharged from custody. It will easily be seen that this decision has absolutely no bearing upon the case now being considered.

The next case cited by counsel for Pesquera is that of Oates v. United States, 147 C. C. A. 207, 233 Fed. 201. In this case Oates and others had been found guilty of contempt of court for violating an injunction, which injunction had been issued in connection with certain labor troubles in a coal mine in West Virginia. The action of the district judge was upheld by the court of appeals. In this case the higher court repeats the old familiar doctrine that in order to convict a man of criminal contempt the trial court must be convinced of the guilt of the accused beyond a reasonable doubt. The evidence in the case is reviewed at considerable length, and the appellate court agrees with the judgment of the lower court. Oates was sentenced to six months' imprisonment and the payment of costs, and this judgment was affirmed. I have read this case carefully and find nothing in it justifying me in reaching a judgment of not guilty in the present case.

I have also read the case of Kelly v. United States, cited by counsel for Pesquera, and reported in 163 C. C. A. 197, 250 Fed. at page 947. Kelly was a lawyer and was found guilty of contempt of court and fined $500 for improper conduct in conversing with certain members of a jury engaged in the trial of a criminal case against ten defendants, two of whom were the clients of Kelly. The judgment of the district judge was affirmed, and the upper court distinctly says that in order that

United States v. Pesquera.

a person may be held for contempt for communications with jurors it is not necessary to prove that the communications had or acts were accompanied by a wrongful intent, but that it is sufficient if they would have a tendency to affect improperly the action of the jurors. I am at a loss to understand why counsel for Pesquera cite this case to me. It goes farther to support the contention of the district attorney in the present case than he himself has claimed. It is distinctly charged in the present case, and I myself have found the fact to be, that there was a wrongful intent on the part of Pesquera as well as on the part of Mayo; but so far as Pesquera is concerned, according to the doctrine of the court in this Kelly Case, he (Pesquera) would be guilty even if he had no wrongful intent, because his communications with Mayo, beyond any question, would have a tendency to affect improperly the action of Mayo. I would be perfectly willing to rest my decision in the present case upon the opinion of the court in this Kelly Case.

Then we come to the case of Hayes v. Fischer, 102 U. S. page 121, 26 L. ed. 95. I do not understand why counsel for Pesquera cited this case to me. An injunction had been granted against Hayes restraining him from using a certain patented device. Complaint was made that he violated this injunction and proceedings for contempt were instituted against him which resulted in an order by the court that he pay to the clerk the sum of $1,400 as a fine and that he stand committed until such order should be obeyed. This fine was imposed by the Federal court in New York city. Hayes applied to the Supreme Court of the United States for a writ of error and such writ of error was denied him. I see nothing in this case in any way affecting the present case.

United States v. Pesquera.

The next case which I have been asked to study is that of the California Artificial Stone Paving Co. v. Molitor, 113 U. S. page 609, 28 L. ed. 1106, 5 Sup. Ct. Rep. 618. This was a suit in equity in which an injunction was sought against the use of an invention for an improvement in pavements, plaintiff having obtained a patent. The defendant continued to lay the pavements. The plaintiff proceeded against him for contempt, alleging that the defendant was still using the process of the plaintiff. The defendant denied this and answered that the process used by him was different from the process controlled by the plaintiff. On this question there was a division of opinion in the United States circuit court of California. The only point that the Supreme Court decided was that where the judges of the circuit court disagree there can be no judgment of contempt. The defendant was ordered to be discharged. Mr. Justice Bradley, speaking for the Supreme Court, says: The "process of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." I fail to see that this decision has any bearing whatever upon the present case now under consideration by the court. The California case arose out of a dispute between two private individuals; the present case arises out of a charge of criminal contempt brought by the United States against two persons, one of whom was an officer of this court, the other, an officer under the United States government.

We next come to the very famous case entitled Re Debs, reported in 158 U. S. at page 564, 39 L. ed. 1092, 15 Sup. Ct. Rep. 900. Eugene Debs and several others had been found guilty of contempt in violating an injunction which grew out

of a railroad strike which resulted in delay in the transportation of the United States mails. They were sentenced for terms in jail varying from three to six months. After they unsuccessfully sought a writ of error, they applied to the United States Supreme Court for release on habeas corpus. The unanimous decision of the United States Supreme Court was to the effect that after the injunction had been issued and served upon Debs and his associates the trial court had authority to inquire whether its orders had been disobeyed, and upon finding that they had been disobeyed they acted properly in proceeding under Revised Statutes, § 725, Comp. Stat. § 1245, to enter the order of punishment complained of. It was further held that inasmuch as the circuit court had full jurisdiction in the premises its findings as to the fact of disobedience are not open to review by means of a habeas corpus in the Supreme Court of the United States, or in any other way. It seems to me that the language of Justice Brewer, who wrote the opinion in this case, supports the contention of the United States district attorney in the case now being passed upon by me, and that it in no way helps the cause of either defendant.

The next case is that of O'Neal v. United States, reported in 190 U. S. page 36, 47 L. ed. 945, 23 Sup. Ct. Rep. 776, 14 Am. Crim. Rep. 303. This was a contempt proceeding which grew out of a bankruptcy case. The bankrupt O'Neal became enraged and assaulted the trustee, whose name was Greenhut, and the United States district judge in Florida found O'Neal guilty of contempt of court and imposed a sentence of sixty days' imprisonment in the county jail at Pensacola, Florida. O'Neal sought to have this judgment reviewed by the United States Supreme Court by means of a writ of error, and the

writ of error was dismissed. I am unable to understand why counsel for Pesquera cited this case.

The next case is that of the United States v. Shipp, reported in 203 U. S. page 563, 51 L. ed. 319, 27 Sup. Ct. Rep. 165, 8 Ann. Cas. 265. This case is quite a remarkable one, and it grew out of a trial before one of the state courts in Tennessee, which resulted in the sentence of death being imposed upon a colored man named Johnson. Counsel for Johnson soon after the sentence presented a petition to the United States circuit court for writ of habeas corpus. One week later the matter was heard by the United States circuit court and the petition for writ of habeas corpus was denied. A stay of proceedings for ten days was granted in order to enable Johnson to prosecute an appeal to the United States Supreme Court, and one week later this appeal was allowed by Mr. Justice Harlan, then on the United States Supreme Court. Two days later the Supreme Court itself made an order directing that all proceedings against Johnson should be stayed. The Tennessee sheriff was notified by telegram and received the news upon the same day. A mob broke into the jail that night in the absence of the Sheriff Shipp, took Johnson out of the jail and hanged him. It is stated in the opinion by Mr. Justice Holmes that Sheriff Shipp and his jailor, whose name was Gibson, pretended to do their duty, but really sympathized with the mob and abetted this act of lynching. The question arose as to whether or not the action of Sheriff Shipp was or was not a contempt of the Supreme Court of the United States, and it was decided that at least a prima facie case had been made out, and it was directed that the trial of the contempt proceedings should

United States v. Pesquera.

proceed. This case is one of great interest, but I am unable to see what possible bearing it has upon the present case.

The next case cited is another one quite famous in the books. Its title is Gompers v. United States, another opinion by Mr. Justice Holmes, 233 U. S. page 604, 58 L. ed. 1115, 34 Sup. Ct. Rep. 693, Ann. Cas. 1915D, 1044. This case grew out of the alleged violation of an injunction. The courts of the District of Columbia had imposed thirty days' imprisonment upon Samuel Gompers. It appeared that the violation of the injunction had occurred more than three years before the presentation of the information for contempt. The Supreme Court held, that, while this judgment could not be reviewed by appeal or writ of error, the Supreme Court did have power to grant a writ of certiorari to review the judgment of the lower court. The Supreme Court in effect held in this case, that, inasmuch as the Statute of Limitations in an ordinary criminal case was three years, the same rule ought to apply by analogy to a proceeding in the nature of a criminal contempt. I am equally unable to ascertain why counsel for Pesquera cited this case in behalf of any right claimed by their client.

Then we come to another famous case, that of the Toledo Newspaper Co. v. United States, reported in 247 U. S. page 402, 62 L. ed. 1186, 38 Sup. Ct. Rep. 560. It appears that there was litigation pending before the United States district court at Toledo, Ohio, involving public service corporation which controlled and operated practically all the street railways in the city of Toledo. Important questions arose as to the rights claimed by this corporation under certain disputed franchises. Great public interest arose, meetings were held, and strong language was used by certain speakers represent-

ing certain labor unions concerning the court, and the matter then under consideration. A few days later publications condemning the court appeared in a newspaper published by the Toledo Newspaper Company. Thereafter the United States district attorney under the order of the court presented an information for contempt against the Newspaper Company and its editor. The court found the defendants guilty and imposed punishment by way of fines. The case thereafter went to the circuit court of appeals for the 6th circuit, and the action of the trial court was affirmed. Those interested in the details of the decisions of the lower courts may read 220 Fed. p. 458, and 150 C. C. A. 636, 237 Fed. p. 986. A majority of the justices of the Supreme Court of the United States affirmed the judgment which imposed the fine. The courts say that the power to punish for contempt is essentially one of self-preservation. Also that the test of the power is in the character of the acts in question. "When their direct tendency is to prevent or obstruct the free and unprejudiced exercise of the judicial power, they are subject to be restrained through summary contempt proceedings." It is also held in this case that publications of this nature are wrongful, that they are not within the freedom of the press, nor is there anything in the Judicial Code intending to sanction them.

The last case of the United States Supreme Court relied upon by counsel for Pesquera is that of Ex parte Hudgings, reported in 249 U. S. at page 378, 63 L. ed. 656, 11 A.L.R. 333, 39 Sup. Ct. Rep. 337. This case is interesting, but nothing at all like the present case. Hudgings was a witness in a case being tried in Brooklyn, New York, before the United States district court and Judge Howe, who was then presiding,

United States v. Pesquera.

became satisfied that Hudgings was purposely testifying false-
ly in open court. Judge Howe at once held him guilty of con-
tempt and ordered his arrest. Later, but on the same day, the
grand jury presented an indictment for perjury against Hudg-
ings. The latter could not be released on bail because he con-
tinued to be held under the commitment for contempt. Mr.
Chief Justice White delivered the opinion of the court after the
Supreme Court had granted a writ of habeas corpus. He holds,
that while perjury is punishable as a criminal offense, this is no
reason why it may not also afford basis for punishment as a
contempt, yet perjury in open court is not of itself punishable
as a contempt, apart from its obstructive tendency. He also
holds that a district judge has no power to adjudge a witness
guilty of contempt solely because, in the court's opinion, he
is willfully refusing to testify truthfully, and that the district
judge exceeded his power when he confined the witness until
he should purge himself by giving such testimony as the court
itself deemed to be truthful. Thereupon the Supreme Court
held that the writ of habeas corpus was properly invoked, be-
cause the district judge had acted beyond his powers. The facts
of the Hudgings case and the facts of the case now being de-
cided by this court are so entirely different that I am at a loss to
know why counsel for Pesquera asked me to study this case.

There remain two decisions of state courts which have been
cited by counsel for Pesquera.

The first is Ex parte Duncan, decided in 1901 by the court of
criminal appeals of the state of Texas, one member of that
court dissenting. This case is reported in 42 Tex. Crim. Rep.
661, 62 S. W. at page 758. Duncan was an attorney and he
had been been named as a member of a committee to examine

United States v. Pesquera.

applicants for admission to the bar. There was a question as to whether the order naming this committee was valid; but, whether valid or not, Duncan failed to appear, was adjudged guilty of contempt, whereupon he was arrested and brought into court. The presiding judge directed the examination of the applicants to continue, and Duncan then stated in open court that he refused to be a member of the committee and that he had previously told the judge that he could not serve, giving his reasons, and that he had always treated the court as a gentleman should and expected to be treated in the same manner by the court, etc.; to which the presiding judge replied that he would fine Duncan if the latter did not desist making such remarks, and Duncan stated that if he was fined and had the money he would pay the fine, and if not he would go to jail. Shortly after being incarcerated he applied for a writ of habeas corpus, and the writ was granted. It was held that Duncan's language when considered in connection with the unlawful arrest did not constitute any contempt of court. The case seems to turn almost entirely upon the question as to whether the arrest of Duncan was legal or illegal. It is a very interesting case to read, but I fail to see any feature corresponding to the matter now under discussion.

The remaining case cited by counsel for Pesquera is that of State ex rel. Kimbrell v. Clark, decided by the Kansas city court of appeals in 1908, reported in 134 Mo. App. 55, 114 S. W. page 536. It seems that there was a civil case on trial before a jury and during the trial Clark was charged with having eaten lunch at a hotel at the same table with three of the twelve jurors; that on the following day he played games of pool with them and treated them to cigars and engaged in con-

versation with them in the courthouse. The trial judge held that Clark was guilty of contempt of court and imposed a sentence of three days in the county jail. The record did not show that Clark was at any time alone with these jurors, nor that he approached them or sought them out, nor that he talked about the case on trial. There was no satisfactory evidence showing that either of these jurors supposed or suspected that Clark was endeavoring to influence them, and it further appeared that in no respect did these occurrences in any way affect the action of these jurors. We quote the following from the opinion in this case: "In forming our conclusions we have not been unmindful that among the basest of bad men there are corrupters of juries, and that, while some of them are ignorant and coarse in their methods, others are smart and artful, and that, if distinction should be made among felons, the latter class deserve the severer punishment. Yet a just indignation against such enemies of justice and social order ought not to be allowed to so far throw us off balance as to permit the enormity of an accusation to lead us into convicting one against whom there is no evidence of guilt." The analysis of this decision is to the effect that, although the conduct of Clark constituted an impropriety, he was not guilty of contempt of court. It will be plainly seen that the facts of the Clark case are very trivial when placed side by side with the facts established by the evidence in the case now before this court.

So much for the authorities cited by counsel for Pesquera.

When we come to consider the presentation of the case by Mr. Wood, counsel for Mayo, the only authority cited by Mr. Wood is found in the 8th chapter of the Gospel according to St. John, verse 11, which of course is the very remarkable

Sermon on the Mount. This court was very much more impressed by the magnificent elocution of Mr. Wood and his talents as an orator than with the logic of his argument. He began his address with the statement that the evidence against his client was so weak as to make it impossible for the court to render any other finding than that of not guilty, and that the conduct of Mayo from beginning to end had been that of a pure, upright man; but his peroration consisted in an appeal to this court to follow the judgment of the Saviour of all mankind when he said to the fallen woman, "Neither do I condemn thee, go and sin no more." The only comment I wish to make in connection with this appeal is that the Saviour was administering divine justice, whereas we poor mortals sitting on the courts of the United States are bound to administer justice according to the precedents of the higher Federal Courts, and enforce the acts of Congress as best we can in accordance with the established precedents.

Furthermore, it is clear that I could not say to Mr. Mayo "go and sin no more" unless it were conceded that he had already sinned. Therefore, I am bound to conclude that when the counsel for Mayo began his impressive appeal there was in his own mind a belief in the innocence of his client, but when he reached his peroration this belief was changed, and that he deemed his client guilty, but did not wish him punished.

This case is of such importance that before I reached a decision I wished to satisfy my own mind as to decisions in contempt cases which I might find by my own research. On page 25, vol. 9 of the Cyclopedia of Law & Procedure I find the following language: "Disclaimer of intentional disrespect or design to embarrass the due administration of justice is as a

rule no excuse, especially where the facts constituting the contempt are admitted or where a contempt is clearly apparent from the circumstances surrounding the commission of the act." Many authorities are cited in support of this proposition of law. The writer goes on to say that disavowal of any intention to commit a contempt may, however, extenuate or even purge the contempt.

I shall keep in mind this latter statement of the law when I come to consider the question of proper punishment, but it is questionable whether the evidence in this case shows anything which may be properly deemed a disavowal. A person may pretend that he disavows the intention to commit a contempt and at the same time his actions contradict such disavowal.

One of the most luminous decisions on this question that I have been able to find is reported in Kirk v. United States, 112 C. C. A. 531, 192 Fed. page 273. It seems that in January, 1911, an information was filed by the United States attorney for the western district of Washington against E. D. Kirk and another. There was a man named Hillman charged in six indictments with having violated certain statutes of the United States, and the cases had been set for trial for January 31, 1911. About the middle of that month Kirk, who was managing a detective agency, was employed by Hillman to seek acquaintance, either himself personally or through some of his associates, with certain jurors whose names were on a list of a venire then in attendance upon the court, from which list the jury was to be selected in the trial of these cases against Hillman. The conversations between the employees of Kirk and one of the jurors, coupled with the suggestion that money

might be paid for the purpose of influencing the action of this
juror, in case he should be chosen as one of the twelve to try
Hillman, took place about nine blocks distant from the build-
ing in which the Federal court was sitting, these blocks averag-
ing 300 feet each. In other words, the acts which were claimed
to constitute the contempt took place about half a mile from
the court building. The judge of the district court, after hear-
ing all the evidence, found that Kirk and his associate were
guilty of contempt and he sentenced them to imprisonment.
They sought a writ of error to the circuit court of appeals for
the ninth circuit. Mr. Circuit Judge Gilbert writes a long
opinion and he cites many cases which I would like to embody
in this opinion, but I find that I am making it too long already.
Judge Gilbert, however, distinctly holds that, although the
Revised Statutes, § 725, Comp. Stat. § 1245, provides that the
jurisdiction of Federal courts to punish contempts shall not be
construed to extend to any case except the misdemeanor of
any person in their presence, or so near thereto as to obstruct
the administration of justice, it does not follow that a finding
of not guilty was due to defendants who attempted to corrupt
jurors whom they expected would sit in a criminal trial about to
be held in the same city, and where such acts occurred in a
saloon several blocks from the place where the court was held:
these acts were committed sufficiently near to the court to
obstruct the administration of justice, and were, therefore,
within the jurisdiction of the court to punish, even though these
actions did not take place on property belonging to the United
States or occupied or used in any way by the court. It is also
held that the filing of a sworn answer explicitly denying the

United States v. Pesquera.

alleged contempt is not necessarily conclusive that the defendant was not guilty.

The case of Re May, reported in 1 Fed. page 737, contains the following language by Judge Brown: "The answer must be credible, and consistent with itself, and if the respondent states facts which are inconsistent with his avowed purpose and intention, the court will be at liberty to draw its own inferences from the facts stated."

This Kirk decision also cites the case of Re Perkins, reported in 100 Fed. page 950. The language in that decision is as follows: "The question of whether a party answering a charge of contempt, whether by rule or otherwise, was guilty of a wilful contempt, or has properly purged himself thereof, is a question for the court in the exercise of a sound judicial discretion." This decision in the Kirk Case closes with an extract from the decision of the United States Supreme Court in the Shipp Case, one of those cited by counsel for Pesquera. The sentences imposed upon Kirk and his associate were affirmed by the circuit court of appeals.

There will also be found in connection with the report of the case of Poindexter v. State as reported in 46 L.R.A.(N.S.) page 517, a most valuable note at page 521 in connection with improper communications with members of a grand jury. It refers to Doan's Case, 17 Pa. Co. Ct. 521, where it was held to be a contempt of court for persons to attempt to induce grand jurors to indict certain persons; that is the reverse of this case now under consideration. Here we have an attempt to induce one member of a grand jury not to indict a certain person. This note refers to the case of Pierce v. United States reported in 37 App. D. C. 582. This case was extremely similar to the

United States v. Pesquera.

Kirk Case in the state of Washington. It seems that there was a trial in the city of Washington and that Pierce was charged with an attempt to influence corruptly a member of a grand jury, and Pierce sought to evade punishment because his conduct occurred in a saloon several blocks distant from the courthouse. The court held that Pierce was guilty of contempt. Pierce endeavored to have this sentence against him reviewed by the United States Supreme Court on a writ of certiorari, but this highest court in the land denied the writ without an opinion, the order being found reported in 223 U. S. page 732, 56 L. ed. 634, 32 Sup. Ct. Rep. 528. The annotator goes on to say that even though improper interference with a juror may be indictable, this fact does not deprive the trial court of the power of dealing with the matter as a contempt. Judge Seymour D. Thompson, in an article in vol. 5 of the Criminal Law Magazine, at page 155, says: "The power of the courts in this regard being founded in the principle of self-preservation, it does not at all go to deprive them of it that the law has provided some other mode for punishing the offender; it is quite immaterial that the offense is indictable. Courts are not obliged to trust the preservation of their dignity and authority to such weak agencies as information, indictment, and trial by jury; it may be before some other tribunal, where the success of the prosecution and the conviction of the offender may depend upon the zeal of a prosecuting witness, of the state's attorney, or upon circumstances purely accidental. Besides, the exigencies may not admit of so tardy a remedy."

The court has found it more difficult to reach a decision satisfactory to itself with respect to the proper punishment in this case, than the determination of the question as to whether

XII. Porto Rico.—33.

### United States v. Pesquera.

these defendants should be held guilty or not guilty of contempt of court. If this case were being heard by me in Springfield, or in Scranton, or in Savannah, or in San Antonio, or in Santa Fe, I would certainly sentence Pesquera to six months in jail, and I would certainly sentence Mayo to two months in jail.

But I have taken into careful consideration the decision of the Supreme Court of the United States in a case which originated in this Island and has been the subject of great discussion here. I refer to the case of Gandia v. Pettingill, decided in 1912 at Washington and reported in 222 U. S. p. 452, 56 L. ed. 267, 32 Sup. Ct. Rep. 127. Previous to this opinion it was my view that anything that constituted a libel in Boston would constitute a libel in San Juan. Mr. Justice Holmes, however, in writing the opinion of the Supreme Court in this case expressly states that there should be "reasonable allowance for the somewhat more exuberant expressions of meridional speech." (The adjective appears in the official volume as *meridianal,* but I am very sure that this is an error of the type, because the proper spelling of the adjective is *meridional.*) In that case the verdict of a jury in San Juan against Gandia for publishing an article that always seemed to me extremely libelous was set aside at Washington. I think it is only fair to the defendants in the present case for me to adopt the philosophy embodied in the opinion of the Supreme Court in the Gandia-Pettingill Case, and impose upon these defendants a sentence much less serious than if these unfortunate occurrences had taken place in one of the forty-eight states of the Union. A similar philosophy, except that it refers to longitude instead of latitude, is expressed by Kipling in his wonderful poem Mandalay, when he makes his British soldier sing as

United States v. Pesquera.

follows: "Ship me somewheres east of Suez where the best is like the worst, Where there aren't no Ten Commandments, and a man can raise a thirst."

It therefore seems apparent to me that in adjusting the punishment for these two men I must take into consideration all their surroundings, not only geographical, but also pecuniary, social, and racial.

With regard to Mayo, I agree with a large part of the eloquent appeal by his counsel that what he did was influenced largely, if not wholly, by his poverty. The substance of Mr. Wood's remarks, as I was able to grasp them, was to the effect that if Mayo had been prosperous instead of impecunious he would not have constantly been in intercourse with Pesquera; in short, that he was tempted by the fact that his pockets were empty and that he must have employment in order that he and his family might eat. Therefore I have decided to impose upon him a sentence of ten days to be served in the jail at San Juan.

Coming to the determination of the just punishment to be imposed upon Pesquera and keeping in mind the observations in regard to his conduct and his own testimony, set forth in the first portion of this opinion, I am convinced that I would fall far short of my duty toward the United States if I were not to impose upon him a penalty more serious than that which I have already decided as proper for Mayo. Pesquera is not only a man of prosperity, but of unusual education, being a graduate of one of the leading universities of the United States. Furthermore, he possessed the confidence of the President of the United States to such an extent that he not only received a very important appointment about fifteen months ago, but the

compensation received by him has been increased and is larger than that of his predecessor.

The latest judicial utterance of importance touching this entire question of contempt arising out of proceedings in any Federal court is found in the extremely important and interesting case entitled Ex parte Craig, reported in 282 Fed. page 138. Craig was and still is comptroller of the largest city in the world. Several exceedingly important corporations operating street railways in New York city were in the hands of a receiver named by the Honorable Julius M. Mayer, one of the Federal judges in New York city, and the receiver had taken possession of these roads and all their assets, and the railways were being operated under the instruction and supervision of that court. The New York state public service commission moved the court for leave to intervene on behalf of the city of New York. The city desired that Mr. Craig should be named as a coreceiver because he was the chief financial officer of the city. Judge Mayer denied the motion in 1919, but without prejudice to its renewal at a later time. Subsequently certain other street railway corporations were also put in the hands of the same receiver. Craig was exceedingly displeased at the action of Judge Mayer and wrote a letter to one of the other officials of the city of New York, in which he twisted and perverted the language of several orders which Judge Mayer had signed and charged the judge in effect with deliberately refusing to protect the interest of the citizens of New York. This letter was not only sent to Mr. Nixon, to whom it was addressed, but Craig caused it to be published in various newspapers. Thereupon Judge Mayer permitted or directed the United States attorney to file an information charging Craig

with criminal contempt. After a demurrer was overruled, an. answer was filed, much testimony was taken, many weeks were given to the counsel of Craig to file briefs. Judge Mayer studied these briefs for over three months, and finally ruled that Craig should publicly withdraw and retract all his obnoxious statements; failing to do so, he should appear for sentence. Craig refused to make the retraction which had been demanded, and the sentence imposed upon him was imprisonment for sixty days in a jail in the city of Newark, New Jersey, some little distance from New York city, and in a different state. Thereafter Craig applied for and obtained a writ of habeas corpus, which writ thereafter was dismissed by the circuit court of appeals, and Craig was remanded for sentence. The opinion in this case is very long and I do not propose to quote very much therefrom. I will say, however, that it seems to me to be exceedingly luminous and of great value to all lawyers and judges interested in this question of contempt of court.

I must cite, however, one extract from the opinion above, which is rendered by Mr. Circuit Judge Rogers, the part which I quote being found on page 153: "The fact that the person involved happens to be an officer of a great municipality, and as such is charged with heavy responsibilities, does not affect the question presented to this court, and which must now be decided. So far as the question of law now presented to this court is concerned, his status is not different from that of the humblest individual in the land. The law is no respecter of persons, and no man can obstruct or interfere with the administration of justice in the courts. As was well said in Chisholm v. Georgia, 2 Dall. 419, 466, 1 L. ed. 440, 460: 'Causes,

United States v. Pesquera.

and not parties to causes, are weighed by Justice, in her equal scales; on the former solely, her attention is fixed; to the latter, she is, as she is painted, blind.' "

Adopting the reasoning of Judge Rogers, and keeping in mind that Pesquera was at the time of these transactions an important officer of the United States government, and as such charged with important duties, this cannot operate to favor Pesquera, the penalty to be imposed on whom I must now decide according to my best judgment. I think I would fall far short of my duty to the United States if I were to impose a sentence upon Mr. Pesquera of less than forty days.

Coming to the place at which this sentence must be served, I would have designated the San Juan jail, except for unfortunate experiences which this court has had in regard to two former contempt cases. One was against an officer of the Insular government, the other against a reporter of a very prominent newspaper in San Juan. On each of these two men I imposed at different times short sentences in the San Juan jail. The well-meaning but misguided friends of these men on each occasion proceeded to make this court an object of scorn by creating the guilty parties into heroes or martyrs. The public press of San Juan rejoiced in extended recitals of the glories heaped upon these two convicted men. The chef of the Palace Hotel was instructed to select the finest steaks, and, after preparing them with great care, to convey them to these men. Their periods of incarceration were sought to be made matters of honor rather than of disgrace by the exceeding effrontery of invitations being sent to some of the most important personages in Porto Rico to visit them at their jail and soothe their hours of supposed separation from the public. The sympathiz-

United States v. Pesquera.

ers with these criminals went so far as to send invitations to his Excellency the governor of this Island; also to the mayor of the city of San Juan. It was reported even that some of the fair ladies of the city carried bonbons and flowers to cheer each of these men in the San Juan jail. The most choice cigars that the factories of Porto Rico could produce were sent there specially marked for these two men who had been condemned by this court. In short, it was sought to glorify them rather than to humiliate them.

The jails in this Island are under the exclusive control of the Insular government, and this court has no direct control over the manner in which prisoners sent there by this court shall be treated, although their subsistence is paid for out of the United States treasury. And this court of course is unable to prevent the possible glorification of Pesquera by his own friends and admirers during the forty days which he is to serve, but this court is able to make it much more difficult for his friends and admirers to glorify him, and for that reason alone the forty days will be served in the jail at Mayaguez.

The cost of this proceeding will be paid one-half by Arthur G. Mayo and one-half by Mariano R. Pesquera.

Done and Ordered in open court at San Juan, Porto Rico, this 12th day of December, 1922.